803 P.2d 254

Raymond NARANJO and Fil Naranjo,
Plaintiffs–Appellees and
Cross–Appellants,

v.

Les PAULL and Mrs. Les Paull, Paull
Petroleum Corporation, GF 83 Ltd. and
ABO 84 Ltd., Defendants–Appellants
and Cross–Appellees.

No. 11502.

Court of Appeals of New Mexico.

Oct. 4, 1990.

Richard E. Olson and Howard R. Thomas, Hinkle, Cox, Eaton, Coffield & Hensley and K. Douglas Perrin, Shamas & Perrin, Roswell, for defendants-appellants and cross-appellees.

Tandy L. Hunt and Charles C. Currier, Hunt & Currier, Roswell, for plaintiffs-appellees and cross-appellants.

## OPINION

HARTZ, Judge.

In 1983 and 1984 Raymond and Fil Naranjo (the Naranjos) invested in two oil-and-gas limited partnerships, GF 83 Limited and ABO 84 Limited. The general partner for each limited partnership was Paull Petroleum Corporation (PPC). Mr. and Mrs. Les Paull were the two directors of PPC. Also, Mr. Paull served as president and treasurer, Mrs. Paull as vice-president and secretary.

The Naranjos sued PPC, Mr. and Mrs. Paull, and the two partnerships as a result of losses incurred in the investments. After a nonjury trial the district court ruled that the limited partnership interests in GF 83 and ABO 84 were securities under New Mexico law but that Mr. Paull failed to register them or apply for exemption from registration. The district court also found that Mr. Paull made various material mis-

representations concerning the partnerships and that the Naranjos relied on those misrepresentations in deciding to invest. The district court entered judgment in favor of the Naranjos against Mr. Paull, awarding damages under the New Mexico Securities Act and punitive damages. The district court denied the Naranjos' claims against PPC, Mrs. Paull, and the partnerships. Mr. Paull appealed and the Naranjos cross-appealed.

On appeal Mr. Paull contends: (1) his offers of rescission to the Naranjos barred his liability under the New Mexico Securities Act; (2) the calculation of damages did not correctly account for offsets to which Mr. Paull was entitled; and (3) the district court erred in awarding punitive damages. In their cross-appeal the Naranjos claim: (1) they were entitled to benefit-of-the-bargain damages, rather than just the statutory damages awarded by the court; (2) they were entitled to treble damages under the New Mexico Racketeering Act; and (3) the district court should have found Mrs. Paull liable (a) because of her relationship to PPC and (b) because of her status as the wife of Mr. Paull, since the liability of Mr. Paull was a community debt. We affirm the district court on all issues, except that we remand for a determination of whether the liability of Mr. Paull is a community debt.

## I. MR. PAULL'S CONTENTIONS ON APPEAL

### A. The Offer to Repurchase the Naranjos' Investment

█ The district court judgment awarded damages against Mr. Paull for violation of the New Mexico Securities Act. The remedies provisions of the Act in effect at the time of the transaction in this case appear in NMSA 1978, Section 58–13–42 (Repl.Pamp.1984). Mr. Paull contends that the Naranjos are barred from recovery by the following language in subsection B:

[N]o purchaser shall claim or have the benefit of this section if he refused or failed to accept, within thirty days from the date of such offer, an offer in writing of the seller to take back the securities in question and to refund the full amount paid by such purchaser, together with interest on such amount for the period from the date of payment by such purchaser to the date of repayment, such interest to be computed:

. . . .

(2) * * * at the rate of ten percent a year;

less, in every case, the amount of any income from such securities that may have been received by such purchaser * * * *

He relies on proposals contained in newsletters sent to limited partners in the two partnerships.

In a two-and-one-half-page letter dated March 25, 1984, and entitled "GF 83 LTD Newsletter," Mr. Paull wrote as follows:

We are involved in one of the most exciting times in the history of oil and gas exploration. Each week brings us closer to our future predictions. Each week makes me more confident that we have done very well already and will do even better. As a matter of fact I am so convinced that we have a real windfall ahead of us that I am prepared to purchase anyone's interest in the partnership, through April 30, for cost plus 25%. That is 25% annual interest on your funds. However, be advised that their worth is significantly greater. Should any of you be desirous of investigating this further please give me a call.

The next few months should begin to yield the fruits of our labors. As you, I am anxious for our first revenue. Best wishes for a great second Quarter.

Then, in a letter to the limited partners of ABO 84 Limited, dated May 15, 1985, and entitled "ABO 84 LTD. NEWSLETTER," Mr. Paull, after a brief introductory paragraph, wrote:

We have not received any revenue yet from the Wilkerson # 1 or # 2 wells, but as soon as it arrives we will send it out with an additional letter.

Obviously we have had numerous successes at drilling and are looking forward to a very lucrative program. However, as in our GF 83 LTD program,

there are a few of you that are in need of liquidity. In light of this idea we are willing to offer all participants the opportunity to recoup 125% of there [sic] investment. We are willing to pay anyone interested in selling there [sic] interest 25% more than their total investment less any monies already received. For example if you invested $20,000 and have received $2,000 in payments, we will pay you $25,000 less the $2000, or $23,000 net. In evaluating this offer you should contact your accountant for the tax ramifications. It is our opinion that the value offered for your interest is substantially less than its ultimate value, but you must make the decision.

This offer is valid for a period of 30 days from this date. If any of you are interested in this offer please contact me as soon as possible. We will be contacting you as soon as the Wilkerson revenue hits.

The district court rejected this defense, finding:

The offers to repurchase submitted by [Mr.] Paull to the [Naranjos] regarding GF 83 Ltd. and ABO 84 Ltd. were not sufficient to cure the defects in the promotion and sale of the limited partnership interest[s] to the [Naranjos] in that [Mr.] Paull did not disclose at the time of the offer to repurchase the earlier misrepresentations which were then unknown to the [Naranjos].

Mr. Paull argues that the proposals satisfied Section 58–13–42(B) and that the district court mistakenly applied the provisions of an amended version of the paragraph, which did not become law until 1986.

The amended law, NMSA 1978, Section 58–138–42(A) (Repl.1986) now provides that a written offer to repurchase securities does not foreclose the purchaser from suing for fraudulent securities practices unless the repurchase offer includes "financial and other information necessary to correct all material misstatements or omissions in the information which was required by [the Act] to be furnished to the purchaser as of the time of the sale of the

security to the purchaser." This new language makes explicit that a seller of securities cannot obtain immunity from civil suit for statutory securities fraud by writing a subsequent fraudulent letter offering to repurchase the securities. Such a provision undoubtedly advances the Act's purpose of protecting investors against fraud. That does not mean, however, that this new provision was already inherent in the pre-amendment statute.

 We should not read language into a statute simply because it would improve the statute, or even because we believe a "reasonable" legislature would have wanted the language in the statute if it had thought about it. In particular, we should be wary of rendering a statutory amendment retroactive by finding the amendment implicit in the earlier version of the statute. Some statutory amendments are mere clarifications; many are not. Judicial self-discipline is essential in determining legislative "intent." Excessive mind reading by the courts becomes improper judicial legislation.

 On the other hand, courts have a duty to recognize what is necessarily implicit in statutory language. "[W]hat is clearly implied is as much a part of a law as what is expressed." *Luria v. United States*, 231 U.S. 9, 24, 34 S.Ct. 10, 13, 58 L.Ed. 101 (1913).

That principle applies here. Clearly implied within Section 58–13–42(B) is the requirement that an offer pursuant to that provision must advise the offeree of the statutory consequences of the offer. Because the letters from Mr. Paull did not refer to the statute or otherwise alert the Naranjos that the proposals foreclosed them from obtaining remedies under the Act, the letters cannot protect Mr. Paull from suit under the Act.

In reaching this conclusion, we first note that the Act nowhere explicitly states that it is enumerating *all* the terms that must be contained in an offer under Section 58–13–42(B). To be sure, the Act spells out the minimum financial terms that must be offered to avoid later suit under the Act—the seller must offer to take back the secu-

rities in exchange for the purchaser's net outlay, plus interest. The Act also expressly states that the offer must be written. The Act does not, however, expressly state that the financial terms are the only terms of the offer that must be conveyed to the purchaser in writing. Nor is it reasonable to infer that no other terms need be included in the offer.

For example, although the Act states that the purchaser has only thirty days to accept the offer, it does not explicitly require the offer to advise the purchaser of that deadline. Yet the time for a response is an essential element of the offer. Since it would be patently unjust to impose on the offeree an undisclosed thirty-day deadline, it cannot be assumed that the financial terms described in Section 58–13–42(B) were intended to be the only terms that must be included in an offer under the Act.

The question, then, is whether the statute implicitly requires that notice of the statutory effect of the offer be included in the offer. The answer lies in the meaning of "offer."

In the law of contracts an offer is a proposal setting forth the essential terms of the prospective transaction. *See* 1 A. Corbin, *Corbin on Contracts* § 11, at 26 (1963) ("In order to be legally operative and to create a power of acceptance, it is necessary that the offer shall contain all the terms of the contract to be made."); *Restatement (Second) of Contracts* §§ 24, 33 (1981) (definition of offer; requirement of reasonable certainty before offer can be accepted so as to form a contract). One of the essential terms of an offer under Section 58–13–42(B) is that the offeree loses the right to relief under the Act.

The notion that a choice, to be legally binding, should be a "knowing" choice is well-established in similar situations. For example, under the doctrine of accord and satisfaction one who accepts a payment is not foreclosed from pursuing a claim against the payor unless the payor made clear the payment's purpose as a settlement offer.

To constitute an "accord and satisfaction" in law dependent upon an offer of the payment of money, it is necessary that the money be offered in full satisfaction of the demand or claim of the creditor, and be accompanied by such acts or declarations as amount to a condition that if the money be accepted it is to be in full satisfaction and to be of such character that the creditor is bound so to understand such offer.

*Miller v. Prince St. Elevator Co.*, 41 N.M. 330, 337, 68 P.2d 663, 667 (1937). *See Holley v. Coggin Pontiac, Inc.*, 43 N.C. App. 229, 233–34, 259 S.E.2d 1, 5 (1979). Similarly, the doctrine of election of remedies requires the election to be an informed one. "The essence of the doctrine of election of remedies is the conscious choice, with full knowledge of the facts, of one of two or more inconsistent remedies." *Adams v. Camden Safe Deposit & Trust Co.*, 121 N.J.L. 389, 394, 2 A.2d 361, 364 (1938); *see Three Rivers Land Co. v. Maddoux*, 98 N.M. 690, 693, 652 P.2d 240, 243 (1982), *overruled on other grounds, Universal Life Church v. Coxon*, 105 N.M. 57, 728 P.2d 467 (1986), *cert. denied*, 482 U.S. 905, 107 S.Ct. 2482, 96 L.Ed.2d 374 (1987).

The principle that a legally binding choice should be a knowing choice would be grossly violated if one could be foreclosed from relief under the New Mexico Securities Act merely by remaining silent in the face of an "offer" that did not refer to the Act or otherwise indicate that relief under the Act would henceforth be barred. One might well be more amenable to the offer if its consequences are known. Traditional legal norms compel the inference that an "offer" under Section 58–13–42(B) must communicate that future suit under the Act is barred. Clearly implicit in the statutory meaning of "offer" is that it convey the essential terms of that section. *See Sachsenmaier v. Mittlestadt*, 145 Wis.2d 781, 789–93, 429 N.W.2d 532, 535–37 (1988) (settlement proposal in correspondence does not constitute "offer of settlement," within meaning of rule providing for award of double costs to offeror when judgment is for less than amount of offer, unless the offeree is informed that proposal is made pursuant to the rule).

Thus, the letters from Mr. Paull do not constitute offers within the meaning of Section 58–13–42(B). Although this was not the ground upon which the district court relied in rejecting Mr. Paull's defense under that section, this is an appropriate occasion for affirming the district court when it is right for a reason not relied upon below. *See State v. Beachum,* 83 N.M. 526, 494 P.2d 188 (Ct.App.1972).

First, the factual predicate for our ruling appears uncontroverted. The letters from Mr. Paull are on their face inadequate under Section 58–13–42(B), as construed above. Also, we are aware of nothing in the record suggesting that the Naranjos were alerted that the proposals in Mr. Paull's letters were intended to be pursuant to the provisions of Section 58–13–42(B). The briefs do not point to such evidence, nor did Mr. Paull submit a proposed finding of fact on the subject.

Second, it is not unfair to Mr. Paull to rely on this ground for decision. Section 58–13–42(B) provides an affirmative defense for a seller of securities who may otherwise be liable under the New Mexico Securities Act. One relying on an affirmative defense has the burden of establishing that defense. *See J.A. Silversmith, Inc. v. Marchiondo,* 75 N.M. 290, 294, 404 P.2d 122, 124 (1965). Neither the Naranjos nor the district court had any obligation to alert Mr. Paull during trial to the need to establish any particular element of his affirmative defense. Therefore, Mr. Paull cannot claim unfairness in not discovering until after trial that he had failed to establish an essential element of his defense.[1]

B. Alleged Errors with Respect to Offsets

1. Offset for Money Received by the Naranjos

■ The computation of the amount of restitution to be awarded a purchaser of securities for violation of the New Mexico Securities Act includes a credit to the seller for income already received by the purchaser from the securities. § 58–13–42(B). Mr. Paull contests the district court's finding with respect to the amount of this credit.

Mr. Paull does not dispute that the district court's finding was supported by testimony of the Naranjos. He claims, however, that the district court should be compelled to accept different figures—figures that appeared on federal income tax K–1 forms provided to the Naranjos by the limited partnerships. He relies on *McCoy v. Alsup,* 94 N.M. 255, 261, 609 P.2d 337, 343 (Ct.App.1980), for the proposition that "[a]n unimpeached writing must be accepted under the best evidence rule in preference to parol evidence based on memory."

The New Mexico Supreme Court has formulated the best evidence rule in SCRA 1986, 11–1002, which reads, "To prove the content of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in these rules or by statute." Thus, whether the best evidence rule applies depends on what the document is intended to prove. To be sure, the K–1 forms themselves were the best evidence to answer the question, "How much did the partnerships report as income to the limited partners on the K–1 forms?" But the content of the K–1 forms had no independent legal significance in this case. Mr. Paull offered the forms into evidence to prove how much income was actually received by the limited partners. That being the purpose of introducing the documents, the best evidence rule did not foreclose oral proof directed to the same issue. *See State v. Landlee,* 85 N.M. 726, 728, 516 P.2d 697, 699 (Ct.App.1973); Advisory Committee Note to Fed.R.Evid. 1002, 28 U.S.C.S., at 990 (1988) ("payment may be proved without producing the written receipt which was given").

---

1. Mr. Paull made no showing of his ability to repurchase the Naranjos' securities for 125% of the amount they invested. Although we do not base our decision on these grounds, we note the inequity of foreclosing the Naranjos' recovery if

Mr. Paull lacked the capacity to perform in accordance with his proposal. *See* H. McClintock, *Handbook of the Principles of Equity* § 86 (2d ed. 1948).

To the extent that *McCoy v. Alsup* extends the best evidence rule beyond the terms of Rule 11–1002, it misstates the law. The district court could rationally reject the K–1 figures in favor of the testimony by the Naranjos, particularly given the failure of Mr. Paull to produce the documentation underlying those figures.

2. Value of Texas Star Resources Stock

■ Mr. Paull also claims that he was entitled to credit for the value of several thousand shares of Texas Star Resources (TSR) stock provided to the Naranjos in exchange for their interests in the limited partnerships, which were closed out as a result of the exchange. The district court's findings and conclusions gave Mr. Paull no credit arising from the TSR stock transaction. We affirm that ruling.

The transaction occurred in May 1987. Mr. Paull relies on an entry in a publication called the National OTC Stock Journal, dated May 25, 1987, quoting a bid price of $4.50 and an asked price of $5.00 for TSR stock. The entry purports to show that market makers in the stock were willing to purchase it at $4.50 a share and sell it at $5.00 a share.

Despite the published quotations, the record supports the district court's determination that the value of the TSR stock to the Naranjos was too uncertain for it to provide an offset. A number of factors contribute to this conclusion.

First, the nature of the market in TSR stock in May 1987 is unknown. There was no evidence of the quantity of stock being traded or who was purchasing and selling the stock. In other words, despite the published quotations, there was no showing that the "bid" and "asked" prices arose in a bona fide market. *Cf.* Hicks, *Defining the Scope of Broker and Dealer Duties— Some Problems in Adjudicating the Responsibilities of Securities and Commodities Professionals,* 39 De Paul L.Rev. 709, 732–39 (1990) (describing over-the-counter market).

In addition, TSR had no track record. It was a new corporation. The Naranjos' transaction occurred barely halfway through TSR's first fiscal year, which would end on October 30, 1987. No audit of TSR was to be performed until the end of the fiscal year. In May 1987 the corporation was authorized to issue 50,000,000 shares; had issued 7,772,000 shares; but had only 750,000 shares that were free trading. An unaudited financial statement for TSR dated March 1, 1987, stated a book value per outstanding share of $1.23. A year after the transaction, no market value for TSR stock was published in the national daily reporting services. In 1989 TSR had virtually no net cash flow.

Furthermore, the Naranjos did not receive free-trading TSR stock in the transaction. The TSR stock they were to receive was stock known as "Rule 144 stock," which is restricted in accordance with 17 C.F.R. Section 230.144. The rule, in general, prohibits sale of such stock for a period of two years after acquisition. Moreover, only twenty-five percent of the stock was to be issued immediately, with seventy-five percent escrowed pending certain future events. As it turned out, the Naranjos never physically received any TSR stock. Mr. Fil Naranjo testified that Mr. Paull informed him that the stock was being withheld until he paid some operating costs of approximately $500 or $600.

Finally, one indication of the value of the TSR stock is the value of the assets exchanged for the stock. The stock was exchanged for interests in limited partnerships that were apparently failing. In recommending the exchange of limited partnership interests in GF 83 Limited for TSR stock, Mr. Paull wrote investors in the partnership that "the meager cash flow" of the partnership was being used "to cover cost of operating."

Taking all these factors into consideration, the district court could properly find that Mr. Paull was not entitled to a credit for the TSR stock. The evidence was not such as to compel the district court to find by a preponderance of the evidence that the Naranjos received something of value in the TSR transaction. *See Sosa v. Empire Roofing Co.,* 110 N.M. 614, 798 P.2d 215 (App.1990).

Our affirmance of the district court on this point is consistent with New Mexico law on damages. In particular, it does not conflict with an oft-stated proposition expressed in *Nosker v. Western Farm Bureau Mutual Insurance Co.*, 81 N.M. 300, 302, 466 P.2d 866, 868 (1970) as: "[L]ack of certainty of proof of damage, which will prevent a recovery, is uncertainty as to the fact of the damage, and not as to its amount. The computation of the amount of damages with mathematical certainty is not required." That proposition is inapplicable here for two reasons.

■ First, *Nosker* was affirming an award of damages challenged as being unsupported by the evidence; it was not ruling that an award of damages was compelled by the evidence. Once damage is established, appellate courts will be reluctant to reverse an award on the ground that the amount is too speculative. *See Nosker v. Western Farm Bureau Mutual Insurance Co. Cf. Ruiz v. Varan*, 110 N.M. 478, 797 P.2d 267 (1990) (failure to prove any damage); *but see Sanchez v. Martinez*, 99 N.M. 66, 71–72, 653 P.2d 897, 902–03 (Ct.App.1982) (must prove damages with reasonable certainty); *Restatement (Second) of Contracts, supra*, § 352 (same); *Restatement (Second) of Torts* § 912 (1979) (must prove damages with as much certainty as nature of tort and circumstances permit). *Nosker* does not require reversal of a fact-finder's rational determination that damages are too speculative to justify an award. On the contrary, appellate courts defer to a fact-finder's decision not to award damages. *Cf. Marchese v. Warner Communications, Inc.*, 100 N.M. 313, 670 P.2d 113 (Ct.App. 1983) (affirming wrongful death award in which jury found damages to be equal to funeral bill).

Second, the proposition stated in *Nosker* is founded, at least in part, on the principle that doubts should be resolved against the party in breach. *See Nichols v. Anderson*, 43 N.M. 296, 301–02, 92 P.2d 781, 784 (1939); *Restatement (Second) of Contracts, supra*, § 352 comment a. When the one whose evidence is uncertain is a wrong-doer seeking an offset, as is the case here, that principle, rather than aiding the one seeking an offset, suggests that doubts should be resolved against that party.

## C. Punitive Damages

Mr. Paull contends that the district court erred in awarding punitive damages against him. Conclusion of Law No. 8 states, "The [Naranjos] are entitled to recover punitive damages from [Mr.] Paull as a result of the fraudulent conduct engaged in by [Mr. Paull] in the amount of $50,-000.00."

■ Mr. Paull is correct that punitive damages is not a remedy provided by the New Mexico Securities Act. *See* § 58–13–42. Nevertheless, the Act states that it does not "limit any statutory or common-law right of any person in any court for any act involved in the sale of securities." § 58–13–42(C). Punitive damages is an appropriate sanction for common-law fraud. *See Hale v. Basin Motor Co.*, 110 N.M. 314, 795 P.2d 1006 (1990). Mr. Paull acknowledges that punitive damages for common-law fraud may be awarded in a securities case. *Cf. Warren v. Bokum Resources Corp.*, 433 F.Supp. 1360 (D.N.M.1977) (federal securities act claim). He contends, however, that the district court rejected the Naranjos' common-law claims.

Common-law fraud "consists of misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act in reliance thereon to his detriment." *Cargill v. Sherrod*, 96 N.M. 431, 432–33, 631 P.2d 726, 727–28 (1981). In its decision and judgment the district court made findings on all these essential elements. The district court also found that the Naranjos invested in the limited partnerships in reliance on the representations of Mr. Paull.

Despite these findings, Mr. Paull contends in his brief that Finding of Fact No. 25 and Conclusions of Law Nos. 7 and 9 in the district court's judgment demonstrate that the district court rejected the Naranjos' common-law fraud theory. We disagree. Finding of Fact No. 25 simply com-

putes the Naranjos' "actual damages" in accordance with the remedies section of the New Mexico Securities Act. Conclusions of Law Nos. 7 and 9 state that Mr. Paull is liable for damages suffered as a result of securities practices and that his representations concerning the limited partnerships amounted to "fraudulent securities practices under New Mexico law." That finding and those conclusions would not contradict an explicit conclusion of law that Mr. Paull was liable to the Naranjos for common-law fraud. There is no reason to assume that they implicitly reject such a conclusion.

At oral argument Mr. Paull also argued that the district court's rejection of the Naranjos' requested Findings Nos. 17, 38, and 40 constituted rejection of the Naranjos' claim of common-law fraud. Requested Finding No. 17, however, related to merely one of a number of alleged misrepresentations by Mr. Paull—an alleged representation that the Naranjos would receive a 4-to-1 return on their investment. Requested Finding No. 38 seeks benefit-of-the-bargain damages based on the allegedly promised 4-to-1 return. Requested Finding No. 40 seeks treble damages pursuant to the New Mexico Racketeering Act. Rejection of these requested findings is consistent with also finding common-law fraud.

Mr. Paull also suggested at oral argument that the district court could have found securities fraud without finding common-law fraud, because the burden of proof for establishing common-law fraud is heavier than for securities fraud. He contended that the court could have found that the evidence of Mr. Paull's fraud was sufficiently compelling to satisfy the preponderance-of-the-evidence standard for securities fraud but was not so compelling as to be clear-and-convincing evidence of common-law fraud. *See Treider v. Doherty & Co.,* 86 N.M. 735, 737, 527 P.2d 498, 500 (Ct. App.1974) (standard of proof for state securities violations is preponderance of evidence, rather than clear-and-convincing evidence, as is required for actual fraud). Mr. Paull, however, supplies no reason why we should not presume that the district court applied the proper standard of proof. Also,

his counsel easily could have clarified the matter by making an inquiry of the district court during the post-trial hearings at which damages and costs were discussed. *See* SCRA 1986, 12–216 (issues must be preserved in district court); *Bassett v. Bassett,* 110 N.M. 559, 798 P.2d 160 (1990). In these circumstances, we refuse to consider Mr. Paull's theory of what the trial judge was thinking.

In short, the district court's award of punitive damages is supported by its findings of fact. Neither the district court's adoption of various findings and conclusions, nor its rejection of certain findings and conclusions requested by the Naranjos, is inconsistent with the award of punitive damages. Often the district court can aid the appellate court by including in its decision a conclusion of law reciting the legal theory upon which relief is granted. *See State Distrib., Inc. v. Glenmore Distilleries Co.,* 738 F.2d 405, 412 n. 4 (10th Cir. 1984) (one reason for findings and conclusions is to aid appellate court). But in this case there can be no substantial doubt that the basis for awarding punitive damages was Mr. Paull's common-law fraud. The district court's Conclusion of Law No. 8 (quoted above) sufficed. *See Consolidated Placers, Inc. v. Grant,* 48 N.M. 340, 351, 151 P.2d 48, 55 (1944); 89 C.J.S. *Trial* § 631 (1955) (general conclusion is sufficient).

## II. THE NARANJOS' CONTENTIONS ON CROSS–APPEAL

### A. Benefit–of–the–Bargain Damages

The Naranjos contend that the district court erred in not awarding them benefit-of-the-bargain damages. They cite *Stewart v. Potter,* 44 N.M. 460, 104 P.2d 736 (1940), for the proposition that a victim of fraud is entitled to the benefit promised by the defrauder. Under that measure of damages the Naranjos could recover the value of the partnership interests as represented by Mr. Paull, less any income or return of capital from their investment, plus interest.

The district court awarded damages to the Naranjos pursuant to the remedies provision of the New Mexico Securities Act, Section 58–13–42(B). That section does not provide benefit-of-the-bargain damages. Damages are computed under a rescission (or "out-of-pocket-loss") theory: the investor returns the securities purchased and receives back the net amount invested, plus interest and attorney's fees.

▮ A victim of fraud in the sale of securities is not, however, limited to recovery of only those damages provided in the New Mexico Securities Act. As already noted in the above discussion of punitive damages, one who recovers under the Act may be entitled additionally to recover for any nonduplicative damages that may be awarded on a theory of common-law fraud. We have also noted that the district court here made all the findings necessary to establish common-law fraud. Thus, the Naranjos established that predicate for the award of damages measured by the benefit of their bargain.

On the other hand, the "benefit of the bargain" is not always the appropriate measure of damages to be awarded a victim of common-law fraud. The district court properly rejected that measure in this case.

▮ The Naranjos claim that Mr. Paull promised them a 4–to–1 return on their investment and, therefore, under the benefit-of-the-bargain measure of damages, they should receive four times their investment. The district court, however, made no finding that the Naranjos relied on an intentional misrepresentation by Mr. Paull that they would receive a 4–to–1 return on their investment. Indeed, the district court rejected the Naranjos' requested finding that "[Mr. Paull's] representation that [the Naranjos] would receive a 4.1 [sic] return on investment, minimum, was a false, misleading and material representation."

Aside from the claim that they were promised a 4–to–1 return, the Naranjos do not argue on appeal that the represented value of their partnership interests exceeded what they paid for their investments. Yet if the represented (or "bargained-for")

value did not exceed the purchase price, they would receive the benefit of their bargain if they were refunded the net amount they invested, plus a reasonable rate of return—that is, a reasonable amount of interest. Consequently, rescission damages and benefit-of-the-bargain damages would be the same. See *Hilburn v. Brodhead*, 79 N.M. 460, 444 P.2d 971 (1968). Because a ten percent interest rate (the statutory rate in this case) is a reasonable interest rate, the statutory remedy gave the Naranjos, in effect, benefit-of-the-bargain damages.

Moreover, even if the district court had found that Mr. Paull had fraudulently promised the Naranjos a 4–to–1 return on their investment, the promise would be too vague to compute benefit-of-the-bargain damages. See *Restatement (Second) of Torts* § 549(2) (1977) (benefit-of-the-bargain damages are recoverable as remedy for fraud in business transaction if damages are proved "with reasonable certainty"). Timing is everything. If the 4–to–1 return is to be achieved in a lump-sum at the end of twenty years, the investment is not nearly as attractive as if the return were to come from a steady flow of income over a shorter period of time. Indeed, at ten percent interest, compounded annually, an investment will more than quadruple in fifteen years. Even the statutory remedy could, at least eventually, provide a 4–to–1 return. Given the ambiguity of the allegedly promised return, the district court properly measured the Naranjos' actual damages in accordance with the formula provided in the remedies section of the New Mexico Securities Act.

## B. Racketeering Claim

▮ The Naranjos contend that the district court erred in not granting them treble damages pursuant to the New Mexico Racketeering Act, NMSA 1978, Sections 30–42–1 to –6 (Repl.Pamp.1989). Although the district court rejected the Naranjos' racketeering claim, they apparently contend that the district court was required to grant relief under that statute because it

made findings in their favor as to all the essential elements required for recovery.

At least one element, however, is missing. The Racketeering Act provides treble damages for one suffering injury as a result of "a pattern of racketeering activity." § 30–42–6(A). "Racketeering" encompasses a number of crimes, such as murder and extortion, and includes criminal fraud. *See* § 30–42–3(A). "Pattern of racketeering activity" is defined in Section 30–42–3(D) as "engaging in at least two incidents of racketeering with the *intent* of accomplishing any of the prohibited activities set forth in Subsections A through D of Section 30–42–4 NMSA 1978." (Emphasis added.) Subsections A through D of Section 30–42–4 state:

A. It is unlawful for any person who has received any proceeds derived, directly or indirectly, from a pattern of racketeering activity in which the person has participated, to use or invest, directly or indirectly, any part of the proceeds or the proceeds derived from the investment or use thereof in the acquisition of any interest in, or the establishment or operation of, any enterprise. Whoever violates this subsection is guilty of a second degree felony.

B. It is unlawful for any person to engage in a pattern of racketeering activity in order to acquire or maintain, directly or indirectly, any interest in or control of any enterprise. Whoever violates this subsection is guilty of a second degree felony.

C. It is unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs by engaging in a pattern of racketeering activity. Whoever violates this subsection is guilty of a second degree felony.

D. It is unlawful for any person to conspire to violate any of the provisions of Subsections A through C of this section. Whoever violates this subsection is guilty of a third degree felony.

With respect to the intent requirement, the definition of a "pattern of racketeering activity" is hardly a model of clarity. The definition of the identical phrase in the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. (1976) ("RICO") includes no intent requirement, so we cannot obtain guidance from federal cases. *Cf. State v. Hughes*, 108 N.M. 143, 148, 767 P.2d 382, 387 (Ct.App. 1988) (New Mexico Racketeering Act is similar to RICO, and federal cases provide valuable guidance).

In any event, we need not construe the definition here. The district court made no finding that Mr. Paull intended to accomplish any prohibited activity. Indeed, the Naranjos submitted no requested finding with respect to the requisite intent. The Naranjos' only requested finding that refers to intent was No. 49, which states, "[Mr.] Paull's false representations were willful and intentional." Similarly, the district court's only finding relating to intent was that Mr. Paull made various misrepresentations "for the purpose of inducing [the Naranjos] to purchase limited partnership interests."

The requested finding and the adopted finding both concern only the intent to commit those acts of fraud that could constitute predicate offenses for a pattern of racketeering activity. Such intent is not enough for the Naranjos' racketeering claim. The intent component of the definition of "pattern of racketeering activity" would be useless if it encompassed nothing more than the intent necessary to commit each of the two incidents of racketeering required by the definition. Generally, we assume that statutory language is not surplusage. *See T.W.I.W., Inc. v. Rhudy*, 96 N.M. 354, 357, 630 P.2d 753, 756 (1981). Without deciding precisely what intent is required by the definition, we can conclude with confidence that the district court did not adopt, and the Naranjos did not propose, a finding that stated the requisite intent.

Given the Naranjos' failure to request a finding with respect to a necessary element of the cause of action under the Racketeering Act, we need not decide whether the evidence established that element. *See*

*Worland v. Worland,* 89 N.M. 291, 293–94, 551 P.2d 981, 983–84 (1976). We affirm the district court's denial of the Naranjos' racketeering claims.

#### C. Liability of Mrs. Paull

The district court ruled against the Naranjos with respect to their claims against Mrs. Paull. The Naranjos contend that Mrs. Paull is liable to them in her capacities as (1) an officer and director of PPC and (2) the wife of Mr. Paull.

#### 1. As an Officer and Director

The Naranjos advance two theories upon which to base liability of Mrs. Paull as an officer and director of PPC. First, they rely on the fiduciary duty of one partner to another. Yet Mrs. Paull's position as an officer and director of PPC did not make her a partner in either of the partnerships in which the Naranjos were limited partners. PPC itself was the general partner in each partnership. To establish liability under their theory, the Naranjos would need to point to a specific breach of fiduciary duty by PPC and explain why Mrs. Paull, as an officer or director of PPC, would bear responsibility for that breach. This the Naranjos have not done. The district court found no liability for PPC, a result that the Naranjos do not challenge on appeal. This court does not have the responsibility of searching the record for evidence that might support liability on the basis of a violation of a partner's fiduciary duty. Thus, we cannot reverse on this theory the judgment in favor of Mrs. Paull.

■ The Naranjos' second theory is that Mrs. Paull's position as an officer and director of PPC makes her liable under the New Mexico Securities Act. After stating that every sale of securities made in violation of the Act is voidable at the election of the purchaser, the Act provides, "The person making such sale * * *, and every director, officer, salesman or agent of or for such seller who participated or aided in any way in making such sale, shall be jointly and severally liable to such purchaser * * * ." § 58–13–42.

There may be sound policy reasons for interpreting the words "participated or aided in any way" broadly in favor of liability. *See Boddy v. Theiling,* 129 Ga.App. 273, 199 S.E.2d 379 (1973). But those words would be deprived of meaning if we held that every director and officer, solely by reason of his or her position, is liable under this provision. *Cf. Goelitz v. Lathrop,* 286 Ill.App. 248, 3 N.E.2d 305 (1936) (applying statutory language imposing absolute liability on officers and directors). The district court found that Mrs. Paull "had only a nominal involvement in [PPC] and was not involved in any of the false representations or self-dealing between [Mr.] Paull and the investors in GF 83 Ltd. and ABO 84 Ltd." Denial of the claims against Mrs. Paull under Section 58–13–42 necessarily follows.

The Naranjos rely on two of their requested findings to support their claim that Mrs. Paull participated or aided in the sales of securities. Requested Finding No. 7 states, "[Mrs.] Paull benefited as executive officer and board member of [PPC] through the receipt of annual salary, payment for and reimbursement for medical expenses, travel and entertainment expenses, child care expenses, car expenses and car insurance expenses." Requested Finding No. 41 states, "[Mr.] Paull's conduct has been ratified by [Mrs.] Paull."

The Naranjos do not, however, explain why the evidence was such as to compel the district court to adopt those findings. *See Sosa v. Empire Roofing Co.* Nor would the findings compel a determination that Mrs. Paull participated or aided in the sale of the partnership interests to the Naranjos. Requested Finding No. 7 does not tie the benefits allegedly received by Mrs. Paull to the sales of securities to the Naranjos. As for Requested Finding No. 41, the only evidence of ratification brought to our attention concerned Mrs. Paull's ratification of her husband's signing her name to a document. Yet this transaction occurred more than two years after the Naranjos purchased their limited partnership interests. Her "ratification" did not constitute participating or aiding in making the sale of securities to the Naranjos.

In sum, the district court properly could have determined that the Naranjos had not proved that Mrs. Paull participated or aided in the sale of securities to the Naranjos.

## 2. As Wife of Mr. Paull

Finally, the Naranjos contend that Mrs. Paull is liable because Mr. Paull committed a community tort. *See* NMSA 1978, § 40–3–9 (Repl.Pamp.1989). The Naranjos' Requested Finding No. 42 states, "[Mr.] Paull's conduct was perpetrated for the benefit of himself and family and as such was a community tort." Their Requested Conclusion of Law No. 16 states, "[Mrs.] Paull is also jointly liable because [Mr.] Paull's fraudulent conduct benefited [Mrs.] Paull as a community spouse and because she directly or indirectly received the benefit of such unlawful conduct. (Section 30–42–4 N.M.S.A. [sic]" The district court made no express findings or conclusions concerning whether the liability of Mr. Paull is a community debt.

Ordinarily, "failure to make a specific finding of fact is regarded as a finding against the party having the burden of establishing that fact." *Brundage v. K.L. House Constr. Co.,* 74 N.M. 613, 617, 396 P.2d 731, 733 (1964). That rule would require us to affirm, since the Naranjos had the burden of persuading the district court that Mr. Paull's liability was a community debt. In this case, however, we are not confident that the district court actually decided whether Mr. Paull's liability is a community debt. The district court may well have relied on a federal case arising in New Mexico, *Dell v. Heard,* 532 F.2d 1330 (10th Cir.1976), for the proposition that determination of whether a tort was a community tort should be deferred until an attempt is made to execute on property for purposes of collecting a judgment. Therefore, we need to examine whether we should follow *Dell v. Heard.* Deciding that we should not, we remand to the district court to address the claim that the liability of Mr. Paull is a community debt.

In *Dell v. Heard* judgment had been entered against the wife for negligently causing an automobile accident. The plain-tiff then sued the husband, claiming that he was liable on two grounds: (1) under the family-purpose doctrine and (2) because the wife's tort created a community debt. After affirming the district court's dismissal of the family-purpose claim, the court of appeals ruled that the second theory failed to state a cause of action against the husband. The court noted that the issue of whether a debt is a separate debt or a community debt is relevant only with respect to execution on the property, *see* NMSA 1978, §§ 40–3–10, –11 (Repl.Pamp. 1989), and that in *McDonald v. Senn,* 53 N.M. 198, 204 P.2d 990 (1949), the determination of whether a tort was a separate or a community debt was made in a suit to foreclose a judgment lien.

We agree with the Tenth Circuit Court of Appeals that it is inappropriate to enter a judgment against one spouse solely because the other spouse has committed a community tort. Such a judgment could readily create confusion, since the judgment ordinarily could not be executed against the separate property of the spouse who was not the tortfeasor. *See* § 40–3–11.

We see no reason, however, why the same court that hears the tort case could not concurrently decide whether the tort was a community tort, at least when, as here, both spouses are defendants. We do not see why such a proceeding should be foreclosed just because the plaintiff may also have the option of waiting until execution on the judgment to litigate whether the tort was a community tort. In other circumstances plaintiffs can combine trial of the underlying claim with proceedings that are material only to collection of the requested judgment. For example, a victim of a tortfeasor who has fraudulently conveyed property to prevent the victim from executing on it could either (1) obtain a judgment on the tort cause of action and then later, when attempting to collect on the judgment, bring an action alleging a fraudulent conveyance or (2) allege the tort and the fraudulent conveyance in the same complaint. *Compare First Nat'l Bank in Albuquerque v. Abraham,* 97 N.M. 288,

639 P.2d 575 (1982) (joint trial of whether (1) defendant owes debt and (2) defendant made a fraudulent conveyance) *with State ex rel. Hill v. District Court of Eighth Jud. Dist.*, 79 N.M. 33, 439 P.2d 551 (1968) (fraudulent conveyance action brought after judgment on underlying debt). *See generally* Annotation, *Right of Tort Claimant, Prior to Judgment, to Attack Conveyance or Transfer as Fraudulent*, 73 A.L.R.2d 749, § 4 (1960) (combining action for damages with bill to set aside conveyance). Joining a claim that a tort was a community tort with the underlying tort claim would seem even more appropriate than joining a fraudulent conveyance claim with the underlying tort claim, because evidence concerning the commission of the tort may well be relevant to the determination of whether the tort was a separate tort or a community tort.

We note that permitting the determination of whether a tort was a community tort at the trial of the underlying tort claim apparently has not created intractable problems in other jurisdictions. *See Garrett v. Shannon*, 13 Ariz.App. 332, 476 P.2d 538 (1970) (reversing judgment on the pleadings that community property not liable for the tort); *Reese v. Cradit*, 12 Ariz. App. 233, 469 P.2d 467 (1970) (affirming judgment that fraud created community debt, but setting aside verdict as to wife); *Maness v. Reese*, 489 S.W.2d 660, 665, 668 (Tex.Civ.App.1972) (majority holds that discharge of wife was error since community property was subject to tortious liability of either spouse,[2] but dissent contends that the community estate, not the wife, is liable).

Moreover, our supreme court has suggested, in dictum, that in some circumstances a creditor who waits until executing on a judgment may be barred from litigating whether a debt was a community debt. In *First State Bank v. Muzio*, 100 N.M. 98, 99, 666 P.2d 777, 778 (1983), the court wrote, "[F]oreclosure on community real property based on a judgment entered solely against one spouse should not affect the community interest of the other spouse." Also, on at least two occasions involving a promissory note the supreme court, without referring to *Dell v. Heard,* has considered appeals from prejudgment actions brought against a spouse on the ground that the debt was a community debt: *Lubbock Steel & Supply, Inc. v. Gomez,* 105 N.M. 516, 734 P.2d 756 (1987); *First Nat'l Bank in Albuquerque v. Abraham.* No reported New Mexico decision has followed *Dell v. Heard* with respect to the issue considered here.

We recognize that our decision today raises questions that we have not answered. For example: Must both spouses be joined as parties before the court rules on whether a debt is a community debt? *See generally* W. McClanahan, *Community Property Law in the United States* § 10:8, at 496 (1982). When, if at all, does prejudgment failure to litigate whether a debt was a community debt bar the creditor from litigating the issue while attempting to execute on the judgment? Because those issues were not briefed, we do not pass on them at this time.

We remand to the district court to make an explicit determination of whether Mr. Paull's liability is a community debt.

## III. CONCLUSION

For the foregoing reasons we affirm the judgment of the district court, except that we remand for an explicit determination of whether the liability of Mr. Paull was a community debt.

IT IS SO ORDERED.

BIVINS, C.J., and JAMES T. MARTIN, District Judge, concur.

---

**2.** Texas Family Code Ann. Section 5.61(d) (Vernon 1975) provides that community property is subject to liability on account of any tort by either spouse.