In re Jerilyn H. SILVER, Debtor.

The Lincoln National Life Insurance Company, individually and as assignee of Santa Fe Private Equity Fund II, LP, Plaintiff,

v.

Jerilyn H. Silver, Defendant.

Bankruptcy No. 7–96–11878 SS.
Adversary No. 98–1281 S.

United States Bankruptcy Court, D. New Mexico.

April 16, 2007.

---

## MEMORANDUM OPINION IN SUPPORT OF JUDGMENT REVOKING THE DISCHARGE OF JERILYN H. SILVER

JAMES S. STARZYNSKI, Bankruptcy Judge.

Lincoln National Life Insurance Company ("Lincoln") filed a complaint seeking to revoke the discharge granted to debtor Jerilyn H. Silver. Having considered all the evidence and arguments, the Court finds that Ms. Silver's discharge should be revoked.[1]

### PROCEDURAL BACKGROUND

Ms. Silver filed her individual chapter 7 bankruptcy petition on May 2, 1996. Ms. Silver's first meeting of creditors pursuant to § 341 of the Bankruptcy Code was first set for June 12, 1996. Notice of Commencement of Case in Case no. 7–96–11878 ("Main case"), doc 3. The deadline for filing objections to her discharge, pur-

---

1. This memorandum opinion constitutes findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure. The Court's elbow law clerk, James E. Burke, did not participate in this adversary proceeding, including, as will probably be quite apparent to regular readers of this Court's decisions, the preparation of this memorandum opinion.

suant to F.R.B.P. 4004(a), was August 12, 1996. No objection to discharge was filed by either Lincoln, the case trustee Yvette Gonzales ("Trustee") or the office of the United States Trustee inside or outside the deadline. Ms. Silver received her discharge over a year later, on December 17, 1997. On December 17, 1998 pursuant to 11 U.S.C. § 727(d), Lincoln filed a complaint (doc 1) seeking to revoke the discharge granted to Ms. Silver. Following discovery, settlement and mediation attempts, several changes of counsel, reschedulings and other numerous pretrial proceedings, the complaint and the answer thereto (doc 4) came on for trial on the merits.

## ANALYSIS

### 1. General

▆▆▆ Subsections (1) and (2) of § 727(d) provide as follows:

On request of the trustee, a creditor, or the United States trustee, and after notice and hearing, the court shall revoke a discharge granted under subsection (a) of this section if-

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of the discharge;

(2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee; . . . .

2. Ms. Silver sensibly has not argued that the assets and disclosure issues are not material.

3. A copy of the entire proof of claim, including attachments, is attached to Ms. Silver's Memorandum in Support of Defendant's Motion to Dismiss (doc 92).

4. See Pl exs 141 (memorandum opinion and order) and 142 (judgment). The memoran-

The trustee or petitioning creditor must prove the requisite allegations by a preponderance of the evidence, *Mazer v. Jones (In re Jones)*, 178 B.R. 1, 3 (Bankr. D.N.M.1995); *Kaler v. Olmstead (In re Olmstead)*, 220 B.R. 986, 988, 993 (Bankr. D.N.D.1998), and the statute is construed strictly against the objecting party and liberally in favor of the debtor. *Id.; Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir.1997). (Citation omitted.) The property not disclosed or turned over, or the failure to disclose, must be "material". *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir.1987); *Marshall v. Wilson (In re Wilson)*, Not Reported in B.R., 2002 WL 1067450 (Bankr.D.N.H. 2002), at *6 ("Matters are material if they are pertinent to the discovery of assets."). (Citation omitted.) [2]

### 2. Standing of Lincoln as a creditor

▆▆ The first issue to be addressed is standing. Whether Lincoln even has standing to have pursued this action against the Debtor depends on whether Lincoln is a creditor. § 727(d) ("The trustee, a creditor, or the United States trustee may request a revocation of a discharge. . . ."). Lincoln filed a proof of claim (no. 5) in the Main Case [3], attached to which was a copy of a judgment rendered against Mr. Silver, together with a supporting memorandum, issued by the United States District Court for the Northern District of Illinois.[4] The judgment, entered April 10, 1995 but effective retroactively to April 1, 1995, awarded

dum opinion is published as *Lincoln Nat. Life Ins. Co. v. Silver*, 966 F.Supp. 587 (N.D.Ill. 1995). Lincoln also claimed as the assignee of the judgment obtained by Santa Fe Private Equity Fund, L.P., II. Given the Court's disposition of the standing issue based on Lincoln's judgment in its own right, the Court does not need to address the effect of this assigned judgment.

damages against Mr. Silver of $24,173,864.98, comprised of actual damages of $7,134,596 trebled, $1,500,000 in punitive damages, and interest, attorney fees and costs.[5] Ms. Silver does not dispute that the judgment was entered and is valid as to Mr. Silver. And Lincoln concedes that the judgment is not a separate debt of Ms. Silver. Thus whether Lincoln is a creditor of Ms. Silver depends on whether the Lincoln judgment against Mr. Silver is a community debt and therefore a liability of Ms. Silver.

On October 18, 1995, a decree was entered dissolving the marriage of Ms. and Mr. Silver. Pl ex 12, Def ex R. That decree incorporated the Silvers' marital settlement agreement ("MSA") concerning the division of assets and liabilities of those parties. Lincoln asserts that the inclusion of the Lincoln judgment in that document (assigning it to Mr. Silver) constituted an admission by the Silvers that the judgment was a community debt. Unlike many MSAs, this dissolution decree does not specify which assets and liabilities are separate, if any, and which are community. While it seems likely that the parties did consider this judgment to be a community debt (otherwise, one would have expected a statement in the decree or some other related document explaining why a separate liability of Mr. Silver would have to be assigned to him for payment), the Court finds that it should analyze the facts and the law of community property to determine if that is the appropriate conclusion.

■ "Community debts are defined by exclusion in [N.M.S.A.] Section 40–3–9(B)." *Huntington Nat. Bank v. Sproul*, 116 N.M. 254, 258, 861 P.2d 935 (1993).

Section 40–3–9(A) specifically enumerates the categories of separate debts, and any debt "contracted or incurred by either or both spouses during marriage which is not a separate debt" is a community debt. § 40–3–9(B). Because of the "either or both" language, "a community debt can be made by one spouse." *Beneficial Finance Co. v. Alarcon*, 112 N.M. 420, 422, 816 P.2d 489 (1991). Thus, it is presumed that a debt created during marriage is a community debt, and the party asserting otherwise bears the burden of demonstrating that the debt is a separate one. *Sproul*, 116 N.M. at 258, 861 P.2d 935; *Alarcon*, 112 N.M. at 422, 816 P.2d 489, citing *First Nat'l. Bank v. Abraham*, 97 N.M. 288, 290, 639 P.2d 575, 577 (1982); *but see Naranjo v. Paull*, 111 N.M. 165, 177, 803 P.2d 254, 266 (Ct.App.1990) ("[T]he Naranjos had the burden of persuading the district court that Mr. Paull's liability was a community debt.").

The *Sproul* decision is instructive. That case began with a promissory note to a bank in a midwestern state signed by a married man but not by his spouse. After default, the bank sued only the husband and obtained a judgment. The bank then domesticated that judgment in New Mexico, again without naming the wife. It then moved to foreclose the couple's home, which was community property. The New Mexico Supreme Court held that whether a judgment was a community debt could be determined at the time the creditor seeks to foreclose on a judgment lien, 116 N.M. at 265, 861 P.2d 935, and ruled that "[b]ecause one spouse alone can incur a community debt..., the Bank, when loaning money to Mr. Sproul, could reasonably

---

**5.** The proof of claim also asserts a liability arising out of "property purportedly conveyed to Ms. Silver by Mr. Silver pursuant to a Marital Settlement Agreement entered into or about October 18, 1995." The parties have not addressed this claim as a basis for Lin-

coln's status as a creditor, and because of the Court's determination that the judgment is a community debt, an issue which the parties have argued, the Court also finds no need to address that claim.

expect that the Sprouls' community real property would be liable to satisfy the community debt in the event of default." *Id.* at 264, 861 P.2d 935.

In the instant case, Mr. and Ms. Silver were continuously married from November 22, 1962 through the date of their divorce on October 18, 1995 (Pl exs 15, 12; Def exs Q, R.).[6] In 1985 Mr. Silver formed Santa Fe Private Equity Fund II, L.P. and operated it until he was removed in 1987. During that time he engaged in conduct that led Lincoln to sue him for fraud in the Northern District of Illinois. The result was a judgment against Mr. Silver for about $24 million, of which about $8 million was for compensatory damages. Pl ex 142. Lincoln domesticated that judgment in New Mexico. Ms. Silver was not named in either judgment. Lincoln then timely filed a proof of claim in Ms. Silver's chapter 7 case.

There are virtually no significant differences between the two cases, save perhaps one.[7] The *Sproul* case arose from the execution of a promissory note; the Silver case arises from the commission of a tort. Thus the issue arises whether Ms. Silver can escape liability because of the tort origins of the liability.

To begin with, Ms. Silver is not precluded at this stage of the proceedings from arguing that the judgment is a separate debt of Mr. Silver rather than a community debt. The *Sproul* court explicitly ruled that the bank in that case was not precluded from establishing Ms. Sproul's community liability at the time that it initiated the foreclosure on the community residence and by clear implication approved Ms. Sproul's contesting her liability at that stage also. 116 N.M. at 264–66, 861 P.2d 935, citing, among other sources, Willam A Reppy, Jr. and Cynthia A Samuel, *Community Property in the United States* 265

6. On September 28, 1998, in consolidated adversary proceedings nos. 98–1091 and 98–1092, this Court entered an order which, among other things, literally purported to declare that the Silvers' divorce was a "sham" (doc 53). The use of the term "sham" was improvident; this Court's judgment could not have had the effect of undoing a divorce decree entered by a state court. What the Court should have said was that the Silvers engaged in the divorce proceeding for the purpose of hiding assets and not because of true marital incompatibility. Of course, an allocation of debts as between two divorcing debtors does not by itself preclude third-party creditors from pursuing either or both debtors. So that particular language in the order serves only as evidence on the issue of the Silvers' intent about their assets and their creditors.

7. One inconsequential difference is that Ms. Silver aided Mr. Silver at his trial as he represented himself; arguably she was at least on notice to take the necessary steps to intervene and make sure that the judgment expressly absolved her of liability. There is no indication in the *Sproul* case that Ms. Sproul participated or even knew about either trial in which she was not served. However, there was insufficient evidence about that trial and

the surrounding circumstances for the Court to make a ruling or a finding that Ms. Silver could have avoided this liability at that stage of events. And in any event, *Sproul* makes clear that Ms. Silver is not precluded from disputing her individual liability for that tort even at this stage of the proceedings. 116 N.M. at 266, 861 P.2d 935. Indeed, seeking an earlier determination may have been treated as being premature. *See Dell v. Heard,* 532 F.2d 1330, 1334 (10th Cir.1976); *but compare Naranjo v. Paull,* 111 N.M. at 177, 803 P.2d at 266 (while trial court should ordinarily not make a determination of community liability before execution proceedings begin, it may do so) and *United States Fid. & Guar. Co. v. Chavez,* 126 F.Supp. 227, 229 (D.N.M.1954) (wife permitted to intervene in original action to establish her rights in real property sought to be executed on; in addition, plaintiff failed to establish benefit to community of the embezzlements). Nevertheless, Ms. Silver's participation in the Illinois action provided her with detailed notice about the facts of the underlying claim and constructive notice that she too at some future date might have to deal with that claim.

(2nd ed.1982) for the proposition that "New Mexico requires tort and contract debts to be 'classified as community or separate at the time the creditor seeks to be paid' ". *Id.* at 265, 861 P.2d 935. *See also, e.g., Dell v. Heard,* 532 F.2d 1330, 1334 (10th Cir.1976)[8]; *compare Naranjo v. Paull,* 111 N.M. at 177, 803 P.2d at 266 (while trial court should ordinarily not make a determination of community liability before execution proceedings begin, it may do so if convenient). In consequence, as the parties clearly acknowledged by litigating the issue, whether Ms. Silver was liable for the judgment was one of the questions to be determined by this Court.

▮▮▮ Given that the judgment itself does not declare the liability to be Mr. Silver's separate debt, *see* N.M.S.A. § 40–3–9(A)(3), only one other exception is applicable: "a debt which arises from ... a separate tort committed during the marriage, ..." N.M.S.A. § 40–3–9(A)(5).

> This section (57–4A–3 [now N.M.S.A. § 40–3–9]) leaves to the courts the problem of determining whether a tort committed by a spouse during marriage is a "community" or a "separate" tort. Under the rule followed in most community property states, the test to be applied in such cases is an after-the-fact determination of whether the act in which the spouse was engaged at the time of the tort was one which was of actual or potential benefit to the community. If it was of benefit, the tort is a "community" tort, and thus a community debt, to be collected under the provisions of s 57–4A–5.... If the activity in which the tortfeasor spouse was engaged was of no benefit to the community, the tort is a "separate" tort, collectible only as a separate debt under s 57–4A–4.

Bingaman, The Community Property Act of 1973: A Commentary and Quasi–Legislative History, 5 N.M.L.Rev. 1 (1974), cited in *Dell v. Heard,* 532 F.2d at 1334.

A number of New Mexico cases have addressed separate versus community tort liability. *E.g., Beneficial Finance Company of New Mexico v. Alarcon,* 112 N.M. 420, 816 P.2d 489 (wife in charge of family finances fraudulently executed promissory note and mortgage on family home with her brother masquerading as her husband; *held* that "[t]his act, a fraud by one spouse against the other, can be of no benefit to the community"[9]); *Delph v. Potomac Ins. Co.,* 95 N.M. 257, 620 P.2d 1282 (1980) (husband separated from wife intentionally burned down the family home; insurance company required to pay out half of the policy proceeds, which would go to the wife); *Naranjo v. Paull,* 111 N.M. 165, 803 P.2d 254 (wife was officer and director of corporation operated by husband who made false representations to plaintiffs; case remanded to trial court to determine whether the husband's tort benefitted the estate); and *United States Fid. & Guar. Co. v. Chavez,* 126 F.Supp. 227 (plaintiff

---

8. "In one New Mexico decision, prior to enactment of the new community property laws, the after-the-fact determination of a tort's characterization as separate or community was made when suit was brought to foreclose a judgment lien. *McDonald v. Senn,* [53 N.M. 198,] 204 P.2d 990 (N.M.1949). We believe the issues presented by appellant under the community property laws do not set forth a cause of action against appellee but would be determined if and when appellant proceeded to execute on property belonging to appellee."

9. However, in a special concurrence, Justice Ransom wrote: "The fact that the loan proceeds in this case, obtained by fraud, actually were used to pay off community debts would seem to be all that is required to show that the tortious act *did* benefit the community, and for this reason the community should be responsible for that portion of the debt." 112 N.M. at 425, 816 P.2d at 496. (Emphasis in original.)

failed to establish benefit to community of the husband's embezzlements—decided under former law).

■ While the language of some of the cited cases suggest that the burden lies with the plaintiff in these cases to prove the debt to be a community debt,[10] in fact the burden was on Ms. Silver to show that the debt underlying the judgment was Mr. Silver's separate debt.

> The general rule is that a debt contracted for during marriage is presumptively a community debt and the burden of showing otherwise is on the party so asserting. Unless Lillian Abraham rebuts the presumption, she is also liable for the indebtedness.

*First Nat. Bank in Albuquerque v. Abraham,* 97 N.M. 288, 290, 639 P.2d 575, 577 (1982). (Citations omitted.) *Accord, Huntington Nat. Bank v. Sproul,* 116 N.M. at 258, 861 P.2d at 939 ("We presume that a debt created during marriage is a community debt, and the party asserting otherwise bears the burden of demonstrating that the marital debt constitutes a separate debt under one of the categories set forth in Section 40–3–9(A)(1) through (6)." (Citations omitted.)). New Mexico case law which preceded the enactment of the Community Property Act of 1973 was equally clear. *E.g., Strong v. Eakin,* 11

N.M. 107, 126–27, 66 P. 539, 544–45 (1901).[11]

Once Lincoln presented evidence of the judgment (which did not specify that it was the separate debt of Mr. Silver) and that the Silvers were married to each other from 1962 to 1995, Lincoln had established its prima facie case in support of its standing to pursue the relief requested in the complaint. At that point the burden of proof (both of coming forward with evidence and of persuasion) shifted to Ms. Silver to rebut Lincoln's prima facie standing case, which she could do by establishing one of the exceptions to a debt being considered a community debt. Ms. Silver made no such showing.

At best Ms. Silver could argue that there was no evidence of benefit to the community. *See Beneficial Finance v. Alarcon,* 112 N.M. at 423, 816 P.2d 489. Thus, while it appears that the Silvers owned or occupied at least two upscale residences at any given time (Cold Spring, New York, and Camino del Monte Sol in Santa Fe), and that they owned vehicles and expensive artwork, artifacts and furnishings, the $2.2 million loan from Los Alamos National Bank would have been sufficient to finance (or refinance) those acquisitions independent of any proceeds from Mr. Silver's wrongdoing. And Ms. Silver testified that Cold Spring was a

---

10. This erroneous assertion is one of the underlying premises of Ms. Silver's motion to dismiss for lack of standing. Memorandum in Support of Defendant's Motion to Dismiss at 10, 13 (doc 92).

11. "The indebtedness is shown by the proof to have accrued during the existence of the marriage community, which still exists. As a matter of law, therefore, a presumption arises that the property was owned by the marriage community; that the indebtedness was the indebtedness of the community; and that the community property is subject, at least, to such part of this indebtedness as may be chargeable against [the community property].

Of course, this presumption may be overcome by proof that the investment of Mattie L. Eakin in the firm of Eakin & Melini was her own separate property, and her partnership property, upon proper proof, may be established and protected by the judgment of the court; but the burden of proof being cast upon her by the legal presumption which we feel compelled to uphold, and no proof whatever being offered by her, or on her behalf, nor appearing in the case, sufficient to overcome this presumption, we are of the opinion that the court erred in rendering judgment against the appellant dismissing his complaint."

"ruin" when they first acquired it. Similarly, the evidence made it quite likely that the value of the Nambe property (the acquisition of which is discussed in more detail below) was considerably enhanced by the massive renovation project that Ms. Silver directed on the property, including but not limited to literally changing out the soil on a part of the land. However, these facts alone are not sufficient to establish that the community gained nothing from the funds stolen by Mr. Silver. Ms. Silver made no presentation of the community's financial status before the tortious conduct, what property was derived from the tortious conduct and what property was derived from other sources, and what the status of the community's finances were after the completion of the tortious conduct. (Indeed, there was virtually no presentation of any evidence about Mr. Silver's financial status at any time.) While arguably onerous, this showing would seem to be the minimum necessary for Ms. Silver to demonstrate that the community did not benefit at all from Mr. Silver's torts.[12] Since Ms. Silver has not met the burden of establishing the lack of benefit to the community, the Court finds that Lincoln is a creditor of the community, and therefore has standing to bring this action.

### 3. Violations of Section 727(d)(1)

Subsection (1) of § 727(d) provides as follows:

On request of the trustee, a creditor, or the United States trustee, and after notice and hearing, the court shall revoke a discharge granted under subsection (a) of this section if-

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of the discharge;

. . . .

#### a. *Elements of § 727(d)(1)*

What exactly the language "was obtained through fraud of the debtor" means is not obvious. It is clearly a term of art the history of which helps elucidate its meaning:

Every bankruptcy statute of the United States has permitted the impeachment of a discharge. Under the Act of 1800, a discharge could be attacked whenever or wherever pleaded upon any grounds that might have been urged against it in the court of bankruptcy. The Act of 1841 provided for a like impeachment of a debtor's discharge on a showing of "some fraud or wilful concealment by him of his property, ... contrary to the provisions of this act." The Act of 1867 provided for the first time for a direct proceeding in the bankruptcy court to revoke. The sole ground of revocation was the discharge "was fraudulently obtained". The practice on such applications was also provided for; and the application had to be made within two years after the date of discharge.

The Act of 1898, Section 15 [13], also pro-

---

**12.** Even if Ms. Silver were able to demonstrate that the community benefitted only a little by the tortious activity, that would still leave Lincoln with some claim against the community, and therefore it would still be a creditor. 11 U.S.C. § 101(10)(C) (claimant against the community is a creditor).

**13.** Section 15, codified as 11 U.S.C. § 33, provided as follows:

Discharges, When Revoked. The court may revoke a discharge upon the application of

a creditor, the trustee, the United States attorney, or any other party in interest, who has not been guilty of laches, filed at any time within one year after a discharge has been granted, if it shall appear (1) that the discharge was obtained though the fraud of the bankrupt, that the knowledge of the fraud has come to the applicant since the discharge was granted, and that the facts did not warrant the discharge; or (2) that the bankrupt, before or after discharge, re-

vided for a direct proceeding to revoke upon the ground that the discharge was "obtained through the fraud of the [debtor]," but shortened the statute of limitations to one year from the granting of the discharge. . . .

. . .

Section 727(d) is derived from Section 15 of the former Act, . . . .

6 *Collier* ¶ 727.LH[5] ("History of Section 727(d)"). (Footnote added.)

■■ The history of the statute suggests, then, that if the Debtor engages in behavior that would constitute a violation of § 727(a)(2)-(5) [14] but sufficiently conceals that behavior from the creditors or the trustee, then those parties are given an extra period of time to discover the misbehavior and challenge the discharge.[15] Thus, in *Lawrence National Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176 (10th Cir.1991), the Tenth Circuit ruled that a complaint which alleged that the debtor failed to disclose ownership of stock in a company [16] and that the plaintiff had not learned of the fraud until after the discharge had been granted stated a cause of action. That failure to disclose constituted the "fraud in fact which would have barred the discharge had the fraud been known." *Id.* at 180. Stating or illustrating this two-step approach more explicitly

are *In re Jones,* 178 B.R. at 4; *Walton v. Staub (In re Staub),* 208 B.R. 602, 604 (Bankr.S.D.Ga.1997) (§ 727(d)(1) revocation based on § 727(a)(4) false oath or account); *In re Wilson,* 2002 WL 1067450, at *5 ("A complaint seeking to revoke a debtor's discharge pursuant to section 727(d)(1) may be based upon a determination under section 727(a)(2) that the debtor has concealed or transferred assets with fraudulent intent or a determination under section 727(a)(4)(A) that the debtor knowingly and fraudulent [sic] made a false oath or account in connection with his or her bankruptcy case."). (Citations omitted.)

> "Whatever the methodology used, the courts all agree that [t]he fraud required to be shown is fraud in fact, such as the intentional omission of assets from the debtor's schedules. The fraud required to be shown must involve intentional wrong, and does not include implied fraud or fraud in law, which may exist without the imputation of bad faith or immorality."

6 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 727.15[2] (15th ed. revised 2006) ("*Collier*"). (Citations omitted.)

■■ In addition, the statute requires that "the requesting party did not know of

ceived or became entitled to receive property of any kind which is or which became a part of the bankrupt estate and the he knowingly and fraudulently failed to report or to deliver such property to a trustee; or (3) that the bankrupt during the pendency of the proceeding refused to obey any lawful order of, or to answer any material question approved by, the court. The application to revoke for such refusal may be filed at any time during the pendency of the proceeding or within one year after the discharge was granted, whichever period is longer.

**14.** Subsections (2)-(7) "have as their foundation some form of dishonesty or lack of coop-

eration by the individual debtor." David G. Epstein, Bankruptcy and Related Law in a Nutshell (7th ed.2005), 340.

**15.** This would seem clear from the description of the Act of 1800, 2 Stat. 19, *supra,* which permitted a creditor to challenge the discharge at any time after it was issued, on the same grounds as if the challenge had been raised during the original proceeding.

**16.** "[D]ebtor's discharge was obtained through fraud, [and] such fraud consisted of the failure to disclose ownership of stock in E–4 Excavating. . . ." *Id.* at 180–81.

such fraud until after the granting of the discharge", § 727(d)(1), and the creditor "is required to have exercised diligence in investigating the facts during the case, especially after having been put on notice of possible fraud." *Collier,* ¶ 727.15[3]. (Citations omitted.)

The distinction is important, since § 727(a)(2)-(5) has a short statute of limitations; pursuant to Rule 4004(a), F.R.B.P., it is only sixty days following the first date set for the § 341 meeting (regardless of when the § 341 meeting actually takes place or is concluded). A too relaxed view of the "fraud of the debtor" standard would essentially gut the short statute of limitations contained in Rule 4004(a). "If it were not for this restriction, a complaint for revocation would be equivalent to a retrial before appeal." *Collier,* ¶ 727.15[3].

b. *Violations of Section 727(a)*

The two-count complaint alleged that Ms. Silver engaged in a variety of fraudulent transfers with actual intent to hinder, delay or defraud creditors in violation of § 727(a)(2)(A)[17], and that she knowingly made false statements in her schedules and statement of affairs in violation of § 727(a)(4)(A).

17. As will be apparent below, the record also provides ample evidence of Ms. Silver's *concealment* of assets with intent to hinder, delay or defraud creditors, also in violation of § 727(a)(2). The disclosure of the existence of Platinum Group in schedule B/12 barely hints at the complexity of the transactions and reservoir of property that that entity represented. The answer to question 10 of the Statement of Financial Affairs is an outright lie. And that Ms. Silver ended up with one-third to one-half of the furniture, art, etc. that she allocated to her in the divorce evidences how successful that concealment was. These facts are only examples and not a complete list of the evidence of concealment. Nevertheless, because the complaint contained no

Having reviewed the evidence, the Court finds that Ms. Silver did violate the provisions of subsections (2)(A) and (4)(A) of § 727(a).

I. *Use of collateral estoppel to prove fraudulent transfers*

Lincoln argues that the Court can shortcut some of the evidence presented by relying on a default judgment against Ms. Silver and the doctrine of collateral estoppel. On September 22, 1998, the Court (the Honorable Stewart Rose) entered a default judgment against Ms. Silver and other persons and entities in *Gonzales v. Silver et al.,* Adv. Proc. 98–1091, U.S.B.C.D.N.M. (doc 53; Pl ex 43). Lincoln was one of the two plaintiffs in that adversary proceeding. The judgment ruled that various prepetition transfers made by Ms. Silver were fraudulent in violation of § 548.

Federal principles of collateral estoppel apply to prior judgments that are rendered by a federal court. *Murdock v. Ute Indian Tribe,* 975 F.2d 683, 687 (10th Cir.1992), cert. denied, 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993).

*McCart v. Jordana (In re Jordana),* 232 B.R. 469, 475 (10th Cir. BAP 1999), *aff'd* 216 F.3d 1087 (10th Cir.2000) (Table).

count for concealment, and because there was no amendment of the complaint to conform to the evidence, the Court does not find a violation of § 727(d) on this basis. *See In re Edmonds,* 924 F.2d at 180 ("Moreover, Fed. R.Bankr.P. 7009, which incorporates Fed. R.Civ.P. 9(b)(1), requires that a complaint brought under § 727(d) set forth the time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof." [Citations omitted.] ). Notwithstanding the foregoing, however, Ms. Silver's false disclosures are closely bound up with non-disclosures, such that the latter are in essence part of the former.

The doctrine of collateral estoppel precludes relitigation of issues actually and necessarily decided in a prior action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). It can only be applied to subsequent actions when (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *Lombard v. Axtens (In re Lombard)*, 739 F.2d 499, 502 (10th Cir.1984) (failure of state court in rendering default judgment to consider whether architectural services were "property" rather than "services" under Colorado law for purposes of section 67 of the Bankruptcy Act meant that requisite issue had not been addressed in the state court action), citing *Peffer v. Bennett*, 523 F.2d 1323, 1326 (10th Cir.1975)(the nature of the conduct required to impose personal liability in tort for malicious interference with a prospective right of inheritance is so unlike that required to render a will invalid that refusing to allow evidence on all issues in this case would deny the defendant a full and fair opportunity to litigate the issues in either court).

In *Gonzales v. Silver*, defendants were properly served but did not timely respond to the complaint, doc 49, and were thus precluded from having a trial on the merits. Default Judgment, at 2 (doc 53), affirmed on appeal (Pl ex 44 and 45). The result was the entry of the "classic" default judgment against Ms. Silver.

Under federal law. . ., it is clear that a prior default judgment is not entitled to collateral estoppel effect. The classic case is where the defendant was properly served and for whatever reason failed to answer and did not otherwise partici-

pate in the proceeding. Then the matter was not "actually litigated". To hold otherwise would render meaningless the requirement of "actual litigation". Because due process requires that the defendant be properly served, "actually litigated" must mean more than merely having an opportunity to litigate because that is always present if a defendant is properly served.

Russell, Bankruptcy Evidence Manual, 2006 Ed., § 3:12 at 371–72. *Cf. Marlee Electronics Corp. v. Antonakis (In re Antonakis)*, 207 B.R. 201, 205 (Bankr. E.D.Cal.1997) (defendant not precluded from contesting dischargeability adversary proceeding despite federal district court default judgment against him for failure to respond to complaint), *but see Jordana*, 232 B.R. at 476–77 (federal district court default judgment rendered against defendant for failure to comply with discovery collaterally estops defendant in dischargeability adversary proceeding, distinguishing *Antonakis* ). The Court rules that the instant matter is the "classic" sort of default judgment rather than a *Jordana* type of default. The default judgment in *Gonzales v. Silver* did not collaterally estop or preclude Ms. Silver from contesting the issue of whether fraudulent transfers took place, and Lincoln had the burden of coming forward with evidence and the burden of persuasion on that issue.

## II. *Fraudulent transfers in violation of § 727(a)(2)(A)*

■ Lincoln presented substantial evidence of a variety of transfers that the Court finds took place prior to the filing of the bankruptcy petitions with the requisite actual intent of hindering, delaying or defrauding creditors. The Court also finds that various actions taken by Ms. Silver after the filing of the petition, which furthered the transfers, serve as after-the-fact confirmations of Ms. Silver's fraudulent intent.

The transfers began with the amicable or cooperative divorce and marital settlement agreement of October 1995. Pl ex 12, 14 and 15; Def ex Q, R. These documents, apparently prepared by Mr. Silver and almost immediately filed and accepted by the state district court in the adjoining county [18], allocate most of the debts to Mr. Silver and most of the assets to Ms. Silver. The MSA and decree purported to transfer or assign to Ms. Silver property valued by the Silvers at over $393,000.[19]

On November 9, 1995, Ms. Silver and one her sons, Caleb Silver, had signed the document forming Platinum Group, LLC ("Platinum"), and on November 13, 1995, Platinum was registered with the State Corporation Commission. Pl ex 5. Platinum's operating agreement makes Ms. Silver, Claude and Caleb Silver the members of the LLC. Pl ex 50.

Ms. Silver's stated justification for the divorce is legitimate enough; to wit, to protect herself from "David Silver's dealings". A spouse in her position could reasonably want a divorce in order to cut off the continuing flow to her of liabilities being constantly generated by the other spouse. Once the marital link was severed, however, there was no need for further transfers of her assets for that purpose. Nevertheless, Ms. Silver transferred to Platinum the art and furniture and the stock of ADS Financial Services allocated to her from the divorce. Pl exs 36 [20] and 49.[21] Although Ms. Silver contributed approximately $393,000 of Platinum's total capital of either $473,000, Pl ex 54, or $628,000, Pl ex 49, Platinum's operating agreement makes Ms. Silver only a 5% owner. Pl ex 50.[22] On December 5, 1995 attorney Timothy Garcia calculated Ms. Silver's contributions to be 61.61% of the total. Pl ex 58. Mr. Silver arrives at this same figure in the memorandum of August 14, 1996. Pl ex 64. Ms. Silver acted in accordance with this calculation in assigning shares of her interest in Platinum, Pl exs 59 and 60. But those facts do not literally change the terms of the executed operating agreement.

The divorce appears not to have resulted in any material difference in the Silvers' living, social or business relationships with each other.[23] For example,

18. The petition recites that the parties had been living apart since October 14, 1995. The petition was filed and the decree entered only four days later, on October 18, 1995. Ms. Silver testified that they continued to live apart until sometime the next month. The petition and the decree were headed "In the District Court for Las Vegas County", which was corrected to read San Miguel County. The Silvers resided in Santa Fe County.

19. In fact, adding up the listed values for the property allocated to Ms. Silver results in a figure significantly less than $393,000, but the overall amount still exceeds $300,000 without adding in anything for the stock of ADSFIN or ADSCAP.

20. Caleb and Claude Silver and the Silver Children's Trust ("SCT") also transferred significant assets into Platinum.

21. Pl ex 49, a listing of the capital contributions to Platinum by accountant John Burwinkle, appears to be dated November 2, 1995, before Platinum was formed. In fact, Platinum's application for a New Mexico Taxation and Revenue Department CRS identification number states that Platinum started operations in on August 1, 1995. Pl ex 52. The application for a federal employer identification number says that operations began on November 13, 1995. *Id.* Regardless of the exact timing, the effect was to transfer to Platinum upon its formation the bulk of the assets allocated to Ms. Silver in the divorce.

22. The operating agreement lists a total of 105% interests in the LLC; 5% each to Ms. Silver and her two sons, and 90% to Silvia Silver as the trustee for SCT.

23. That fact does not by itself justify a finding of fraud; indeed, such a finding would be

both the Silvers continued to reside at the Nambe property, according to Ms. Silver. Platinum, to which Ms. Silver had assigned most of the property she got from the divorce, hired Mr. Silver to invest Platinum's assets in "entrepreneurial companies" (presumably of Mr. Silver's selecting). Pl ex 46 (Platinum mission statement).[24] Mr. Silver continued to manage Platinum's affairs for years, as evidenced by Mr. Burwinkle's testimony that what he received from Ms. Silver was only for her personal finances (*i.e.*, separate from Platinum and other entities) and that everything else he received was from Mr. Silver. *E.g.*, Pl exs 71 (December 1996 memorandum from Mr. Silver concerning Albert and Leonard Produce Company, LLC), 75 (Mr. Silver's hand written financial statements and notes for Platinum for CY 1996), 80 (same for CY 1997), and 84 (July 27, 1998 instruction letter to Sidney Todres for dissolution of Platinum). And in a further confirmation of the continuing closeness of David and Jerilyn Silver, the operating agreement designated the "principal place of business" for Platinum as 1302 Osage Road, Santa Fe, New Mexico. ¶ 5. This was Mr. Silver's business address from which he ran, for example, ADS Financial Services, Inc. Pl ex 121. On the other hand, the Articles of Organization designated Ms. Silver's then home address of Cumbre Vista as the principal place of business. Pl ex 51, ¶ II. The Court concludes that the Osage Road address is an inadvertent admission of the reality of who was managing the LLC.

There is additional evidence of Ms. Silver's lack of control of Platinum and its assets. She testified that she would distribute deposit slips to Platinum's checking account and others would fill them out and make deposits to the account. She also testified that in February 1997, Platinum was still active, to her surprise. And Ms. Silver testified during adverse direct testimony that she did not cause Platinum to be dissolved. She could not recall what happened to her interest in Platinum and what if anything she had to do with its dissolution.

To be sure, there is contrary evidence that suggests Ms. Silver exercised control of Platinum's assets. *E.g.*, Ms. Silver's October 28, 1997 instruction to A.G. Edwards to liquidate the holdings and issue a check. Pl ex 79. However, even as to this instruction, it is not clear that it was Ms. Silver's independent judgment that led to the transaction or advice or instruction from Mr. Silver or perhaps even from the other members of the LLC. In any event, the control of Platinum that Ms. Silver exercised was relatively small compared with the control that she did not exercise, leading to the conclusion that in effect Ms. Silver, temporarily at least, gave up control of—that is, transferred—a substantial amount of assets.

 Ms. Silver's intent in making these transactions may be inferred from her circumstances, actions and testimony. "Fraudulent intent may be deduced from the facts and circumstances of a case." *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir.1990).

---

foolish in light of the innumerable varieties of human relationships and arrangements that follow after a divorce. In the instant case, however, that otherwise neutral fact contributes to Court's impression that the transfers were not the result of an "arm's length divorce" so much as they were part of a cooperative effort to transfer assets away from creditors.

24. Ms. Silver was one of the three managers of Platinum, the other two being Caleb and Claude. Pl ex 50 (Platinum operating agreement, ¶ 9.1(a)), and Pl ex 51 (articles of organization, ¶ V), but see operating agreement ¶ 9.2(a), allowing only one manager.

In 1986 Santa Fe Private Equity Fund, managed by its state court receiver, filed a chapter 7 petition. A reasonable person would suspect that one or more creditors might assert some personal liability on David's part for investors' losses, and might also suspect that as a resident of New Mexico and married to David, Ms. Silver could also be considered to be liable. That year Lincoln initiated multimillion dollar litigation against David. The action came on for trial in August, September and October 1993 before the United States District Court for the Northern District of Illinois. Ms. Silver was familiar with that litigation, since she assisted David in defending himself at the trial. On September 29, 1995, that court issued its memorandum opinion in *The Lincoln National Life Insurance Co. v. Silver*, 966 F.Supp. 587, awarding judgment of almost $23,000,000 plus attorney fees against Mr. Silver and ADS Partners, Ltd.[25]

When the multimillion dollar award was announced in September 1995, Ms. Silver was indisputably insolvent. Indeed, she was so vastly insolvent as a result of that judgment that she had almost every incentive to conceal her assets from her creditors.[26] Almost immediately thereafter followed the amicable divorce, consummated within less than a week in October, which resulted in the allocation to her of over $300,000 of art, household goods, furnish-ings and other personal property. The formation of Platinum quickly followed in November, which led to the first of a series of transfers of Ms. Silver's assets to third parties.

In the meantime, on September 24, 1995, just five days before the entry of the District Court's memorandum opinion, the Silvers had signed the purchase agreement whereby they personally would be acquiring the Nambe property. Pl ex 86. By the time that purchase was consummated, it was Platinum and SCT who were the purchasers rather than the Silvers individually. Pl ex 90. That is, Ms. Silver also fraudulently transferred her interest in the Nambe property while in effect continuing to possess and improve the property and reside there with David.[27]

The Nambe property was more than four acres of real property located in or near Nambe,[28] New Mexico, sixteen miles north of Santa Fe. Some of the land borders on the Rio Nambe. The property at the time had several improvements on it, including an adobe residence, a barn and a pump house. The property also came with 10.5 acre feet of water rights from the local acequia. On September 24, 1995 the Silvers signed an agreement to purchase the Nambe property from the Wallaces for $495,000. Pl ex 86. By March 1996 the purchase agreement had been amended to make Platinum Group and the Silver Children's Trust ("SCT") the purchasers.[29] Pl

25. The final judgment, in the sum of $24,173,864.95, was entered on April 10, 1996. Pl ex 142.

26. Of course, there was also the countervailing incentive to "do the right thing" and not conceal or transfer her assets.

27. On the afternoon of October 27, Ms. Silver testified that she received nothing for having transferred her interest in the purchase of the Nambe property to other entities, and that in fact she had no idea how that transfer took place.

28. Ms. Silver testified that technically the property is in Pojoaque, and the address is now 109 North Shining Sun.

29. The special warranty deed, allocating ownership of the property, recites in part that the Silvers Childrens Trust [sic] is also known as the Claude A. Silver Trust and the Caleb B. Silver Trust. Pl ex 107. The "Trust Agreement Silver Children's Trust" provides that the trustee shall divide the trust property equally into two shares for each of the children, and that "[e]ach share shall constitute the initial trust estate of a separate trust

ex 90. The bank loan for the purchase was to Platinum and SCT, Pl ex 91, and the settlement statement was signed by Ms. Silver on behalf of Platinum, Pl ex 99, illustrating that Ms. Silver knew that she was no longer the buyer. The warranty deed, executed on June 5, 1996 and recorded June 11, 1996, transfers the property to Platinum and SCT. Pl ex 92. In all of the exhibits which document the transaction[30], and the testimony, there is no evidence of any payment to Ms. Silver for her purchaser's interest in the property. Instead, on August 13, 1996 Platinum and SCT as lessors executed an agreement with Ms. Silver for her to lease the Nambe property for five years at $4,200 per month.[31] Pl ex 102. The lease allocated the rent between Platinum and SCT. A subsequent special warranty deed divided the ownership interest in Nambe among Platinum (30%), the Claude Silver Trust (35%) and the Caleb Silver trust (35%). Pl ex 107.[32] Yet, despite all the paperwork and the fact that the Silvers resided at Nambe continuously (at least up through the date of the trial, in October 2004), Ms. Silver never paid any of the rent, illustrating how the transfers were a way to fraudulently transfer the property away from herself and yet still retain the benefits of ownership and possession.[33]

This intent and action are further illustrated by the massive amount of work that Ms. Silver had done on the property to improve it, work that included removing the weeds, replacing the soil on the property which Ms. Silver declared unusable, planting vines, large gardens (much of which was lavender), and a 100–tree apple orchard, remodeling and renovating the barn, improving the pump house, building a multi-room storage shed, and changing the driveway to accommodate the change in the road.

The grapes, apples and lavender, which might ordinarily be considered the property of the owners of Nambe, became the business product of The Albert & Leonard Produce Company, LLC, a Tennessee limited liability company ("A & L") formed on December 27, 1996. Pl ex 6. Its members were the Claude Silver Trust, the Caleb Silver Trust and Platinum. The mailing address for A & L was the Nambe property "c/o Jerilyn H. Silver, President", and she accepted appointment as the initial registered agent. Ms. Silver signed the application for the company to transact business in New Mexico as a managing member of Platinum, and she also signed at least one of the annual reports submitted to the Tennessee Secretary of State's

which shall be known by the name of the beneficiary for whom the trust was esablished [sic]." Pl ex 1, § 2.1. In consequence this memorandum decision does not significantly distinguish between SCT on the one hand and the two individual trusts on the other hand.

30. Pl exs 93, 94, 95 and 100 (drafts of Wallaces' occupancy agreement showing Platinum and SCT as lessors), 96 (draft note and mortgage for second mortgage note to Wallaces), 97 (recorded Bank of New Mexico mortgage), 98 (promissory note to Bank of New Mexico), and 101 (June 7, 1996 mortgage to Wallaces).

31. The $4,200 serves as a statement by lessors of what they presumably thought was Nam-

be's fair market rental value as it existed before the Silvers' massive improvements of the property.

32. Ms. Silver's execution of the special warranty deed is further evidence of her knowing participation in the transfers.

33. Ms. Silver confirmed the tripartite ownership of the Nambe property in her deposition taken on October 14, 1997. Pl ex 78. "J. Silver Oct 1997 depo." at 4. She also confirmed that David Silver lived there when not traveling, id. at 4–5, and that she could not afford the rent and therefore was paying it by doing "maintenance work". Id. at 4.

office. The articles of organization allocate the ownership of A & L as 30% Claude Silver Trust, 30% Caleb Silver Trust, and 40% Platinum. Approximately one year later, A & L and Nambe's owners, Platinum and SCT, entered into a lease that allowed A & L to use the land to grow the produce, store the produce and equipment, etc., in return for a percentage of the sales each year or a minimum (and minimal—starting at $100/month) cash payment. Pl ex 117.

On October 26, 1997, Alnitak Partners, L.P., a Tennessee limited partnership was formed ("Alnitak"). Pl ex 8. Its sole general partner was Mintaka Corp., a Tennessee for-profit corporation, formed on October 17, 1997. Mintaka's president was "Silvia Silver, Trustee", and she and Jerilynn Silver constituted the members of the board of directors.[34] Nambe was then transferred by Platinum and the Claude and Caleb Silver Trusts to Alnitak by warranty deed recorded in Santa Fe County on December 1, 1997. Pl ex 111. On December 7, 1997, Mr. Silver instructed Mr. Cohen, the Tennessee corporate attorney, to prepare a production agreement (presumably the A & L lease—Pl ex 117) between A & L and Platinum. Pl ex 113. He also instructed Mr. Cohen that Platinum's 40% interest in A & L would be transferred to Alnitak and Platinum dissolved. And this transfer of ownership interests was reflected in the second page to the lease, which constituted both an amendment and the signature page. Pl ex 117. That amendment substituted Alnitak for Platinum.[35] The lease with its "transfer of ownership amendment" was signed by Ms. Silver on December 8, 1997. In July 1998 it appears that Platinum was dissolved, Pl ex 83, with an agreement of (at least some of) the members to transfer Platinum's interest in Nambe and A & L to Alnitak (a fait accompli by this date), and to transfer the art to Alnitak for payment of $85,000, to be used to pay various expenses and the remainder distributed in cash to the members of Platinum. Ms. Silver signed the document twice, although she testified that this was probably one of those many times when she just signed a document that was put in front of her. She testified that she knew of the dissolution of Platinum but not about how it came about, whether she had anything to do with the dissolution, what happened to her interest in Platinum, or whether Platinum received the $85,000 from Alnitak. She did testify that, apparently at the time of the transfer, Platinum still had the art that had been transferred to it.

The transfers that took place after May 2, 1996, the petition date, demonstrate a continuing pattern of transferring assets in order to defraud creditors. That fact is probative on the issue of transfers before the petition, showing her continued efforts to keep her assets away from her creditors.

The timing of these events and transactions can only be reasonably interpreted as an intentional attempt to transfer assets away from the creditors. Ms. Silver's insistence that she was merely acting as instructed, signing papers that were put in front of her without understanding the import of what she was signing, loses its credibility in view of the timing. Ms. Sil-

---

**34.** Mintaka Corp. was dissolved by the Tennessee Secretary of State's office for failure to file the corporation annual report which was due before February 1, 1999. Pl ex 7. Similarly, A & L was administratively dissolved for failure to file the limited liability company annual report required by Tennessee law. Pl ex 6. This suggests that the Silvers were setting up and then discarding A & L and Mintaka as corporate shells to effect further transfers of the property.

**35.** It also changed the wording of SCT as one of the lessors for the Claude and Caleb Silver Trusts.

ver is a sophisticated, educated and highly intelligent person; the effect of transferring the assets could not have escaped her, despite her protestations that she merely "signed where she was told to" and that she paid little attention to her affairs.

At the same time, there was no evidence that, for the most part, Ms. Silver gave up or lost physical possession or actual control of the bulk of the art and furnishings. In other words, despite the technical ownership of the assets in a series of legal entities, Ms. Silver retained the use and enjoyment of them. This fact constitutes evidence not only of intent but also of the success of the attempt to keep that property out of the hands of her creditors.[36] Further evidence of the intent to conceal is that one-third to one-half of the personal property transferred to Platinum and to other entities ultimately ended up in her possession.[37]

### III. False disclosures in violation of § 727(a)(4)(A)

■ Ms. Silver filed her petition on May 2, 1996 (doc 1). She filed her schedules and statement of affairs on June 11, 1996 (doc 7; schedules are Pl ex 17). Her first § 341 meeting of creditors was scheduled for June 12, 1996 and continued to and concluded on July 10, 1996 (Trustee's reports—docs 9 and 10 respectively).

In response to question 10 of the Statement of Financial Affairs ("SOFA"), dealing with "Other Transfers"[38], Ms. Silver answered "None". That was an outright concealment of the transfers to Platinum of the personal property and to Platinum and SCT of the rights to purchase the Nambe property.

It is true that in response to SOFA 2 ("Income other than from employment or operation of business"), Ms. Silver listed "$8,000 (avg per month)" and "Management fee, The Platinum Group, LLC", and that in response to SOFA 16 ("Nature, location and name of business"), she listed "The Platinum Group" at 658 Cumbre Vista, Santa Fe, NM 87501, and "Member/manager of asset Management company" [sic] beginning in "11/95". And in Schedule I, Ms. Silver listed one of her two occupations as "Manager/Member" since "11/95" of "The Platinum Group LLC" at 658 Cumbre Vista, Santa Fe, NM 87501, receiving a monthly management fee of $8,000. While these disclosures would suggest to an outsider that there was likely some substance to the entity identified as Platinum, they in no way make up for the sworn nondisclosure of the transfers. The omission is all the more glaring in light of SOFA 10's demand for the identity of the transferee and a listing and valuation of the property transferred. All that information was easily at hand and already itemized. Indeed, Ms. Silver needed only to have attached the property lists from the divorce decree to the SOFA to have fully answered the question. That she did not disclose such a major transaction, es-

---

**36.** Lincoln submitted additional evidence in support of additional factual theories asserting concealment of assets and the use of those assets by Ms. Silver. The Court does not discuss that evidence and those theories because it considers what it has already discussed is sufficient to establish a violation of § 727(a)(2)(A).

**37.** This was Ms. Silver's testimony on direct adverse examination during Lincoln's case during the afternoon of October 26, 2004.

She made corroborating statements during her testimony the following day.

**38.** The question demands in relevant part as follows:

List all other property, other than property transferred in the ordinary course of the business or financial affairs of the Debtor, transferred either absolutely or as security within *one year* immediately preceding the commencement of this case.

(Emphasis in original.)

pecially when it would have been so easy to detail the transfer and when she was, at the same time, disclosing her connection to Platinum, says that the omission was wilful.

Similarly, in response to SOFA 7 ("Gifts")[39], Ms. Silver listed only two items: a yad (the pointer used for reading the Torah) valued at $150, and $2,000 donated to Santa Fe Pro Musica. There was no mention of the Collagio III painting by Wade Hoefer which the Silvers purchased on November 11, 1995 and then purportedly transferred to SCT (Pl ex 32). Alternatively, with the painting still being in her possession[40], SOFA 14 ("Property held for another person")[41] was answered "None". As with the lack of disclosure about Platinum, what was (not) disclosed about the picture would draw no attention from a creditor or trustee and certainly no threat of an attempted recovery for the estate.

Schedule B, question 12 required disclosure of "Stock and interests in incorporated and unincorporated businesses. Itemize." Her total response was "The Platinum Group, LLC", and concerning the current market value, she said "unknown".[42] This disclosure barely hints at the complexity of the transactions and the considerable value of the assets. Not that using "unknown" is per se insufficient; if there is a genuine question about whether there is any value in an asset, especially an asset with relatively small value, the use of "unknown" might well be appropriate. But here, especially when combined with the response to SOFA 10, the term "unknown" had the effect of a lie.

What Ms. Silver listed on her schedules contrasts strongly with what she had transferred. She listed no real property on Schedule A. Schedule B listed a total of $63,629 of personal property, $56,000 of which were three vehicles, leaving less than $10,000 as the value of all her other personal property. Schedule B/18[43] is marked "None", and B/33[44] lists "Miscellaneous" at $200. Schedule G, for executory contracts and unexpired leases, did not mention the Nambe contract. Listing the Nambe property and the items that went to Platinum would have riveted the creditors' and Trustee's attention on them.

Similarly, at the first § 341 meeting (transcript—Def ex A—"June 341 mtg"), after Ms. Silver had sworn to the accuracy of the schedules and SOFA, *id.* at 4:11–14, the testimony of both the Silvers[45] would

**39.** This question demands in relevant part as follows:

List all gifts or charitable contributions made within *one year* immediately preceding the filing of this bankruptcy case other than ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient.

(Emphasis in original.)

**40.** Ms. Silver confirmed that the painting was purchased in her name in her deposition taken on September 23, 2003. "J. Silver Sept 2003 depo." at 54:2 through 55:13, attached as Exhibit A to Lincoln's Trial Memorandum (doc 141).

**41.** "List all property owned by another person that the Debtor holds or controls."

**42.** Schedule C also listed the value of Platinum as "unknown".

**43.** "20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the Debtor, and rights to setoff claims. Give estimated value of each."

**44.** "33. Other personal property of any kind not already listed. Itemize."

**45.** Even though they had filed separate petitions, both the Silvers appeared with their counsel at the same first § 341 meeting. June 341 mtg. (Def. ex A). The Trustee directed either one of them to "just jump in" if either could answer a question she posed. *Id.* at 5:12–13. Neither Debtor objected to that approach, and the Court has assumed, based on the Trustee's invitation to "jump

leave the uninformed listener (or reader) with the distinct impression that Ms. Silver had lost her home and most of her art and furniture to Los Alamos National Bank and that she was left with relatively little in the way of personal possessions (other than $56,000 worth of vehicles). *See generally id.* at 5:15—8:15; 14:2—15:1 (vehicles); 21:16–22:9 (vehicles). When she spoke of Platinum, it was only about the value of the stock of ADS Financial and not the other personal property that had been transferred; indeed, she directly denied that Platinum owned any other assets beside the stock. *Id.* at 8:23—10:8. She denied having "given away" anything other than the listed donations in the previous year. *Id.* at 23:18–23.[46]

That Ms. Silver's false statements and related non-disclosures were intentional is further illustrated by her delaying tactics when Lincoln and the Trustee sought records and other information about her assets. *E.g.*, Order Granting Application for Jerilyn Silver's Rule 2004 Production, docketed November 26, 1996 (doc 28); Motion for Sanctions for Violation of November 26, 1996 Order Granting Application for Jerilyn Silver's Rule 2004 Production, filed January 15, 1997 (doc 31); Order on Motion for Sanctions for Violation of November 26, 1996 Order Granting Application for Jerilyn H. Silver's Production (requiring "that Jerilyn Silver surrender to the Trustee, or the Trustee's representative, every scrap of paper she has in every location forthwith"), docketed February 12, 1997 (doc 33); and Joint Motion by Lincoln National and the Trustee for Sanctions for Violation of February 12, 1997 Order on Motion for Violation of November 26, 1996 Order Granting Application for Jerilyn H. Silver's Production, Exhibit A (March 5, 1997 letter from Ms. Silvers counsel announcing lack of access to record storage facility), filed March 10, 1997 (doc 34).[47]

■ That a debtor has the obligation to disclose accurately and timely is obvious from a reading of the statute, the rules and the forms.

> The statutes [like § 727(a)(4) ] are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceeding, so that decisions can be made by the parties in interest based on fact rather than fiction. . . . Neither the trustee nor the creditors should be required to engage

---

in", and on the way the § 341 meeting was conducted, that a statement by one of the Debtors that the other Debtor did not correct or disagree with orally, was intended by the Debtors to be taken as the testimony of both Debtors.

**46.** By the time of the reconvened § 341 meeting on July 10, 1996 (transcript—Def ex B), Ms. Silver had become much more accurate in her testimony. For example, she admitted the transfer from herself to Platinum of the art and furnishings and the value of those items, *id.*, 7:24–11:5 and 14:9–15:9, and described Platinum and its operations, ownership and personnel much more fully. *Id.*, 18:18–29:15. (The July 10 testimony is described in more detail in the text below.) Doubtless this change of attitude or tactics served her well. However, she never correct-

ed the schedules and the SOFA. And in any event, she never disclosed the transfer from herself and Mr. Silver of the rights to purchase the Nambe property.

**47.** The Honorable Stewart Rose conducted a preliminary hearing (at which no testimony or exhibits were permitted, as required by NMLBR 9013–1(d) (eff. August 1996)) on the March 10, 1997 motion, and scheduled a final hearing. The final hearing was never conducted, and no final order was ever entered on the motion. The motion asked for a default judgment and other relief. That no order was ever entered on the motion is irrelevant; rather the entire collection of motions (including the March 5 letter) and orders demonstrates Ms. Silver's pattern of non-disclosure.

in a laborious tug-of-war to drag the simple truth into the glare of daylight. *In re Tully,* 818 F.2d at 110, quoted in *Woolman v. Wallace (In re Wallace),* 289 B.R. 428, 433 (Bankr.N.D.Okla.2003) (debtor's failure to cooperate with trustee constituted evidence of fraud). "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." *Matter of Yonikus,* 974 F.2d 901, 904 (7th Cir.1992) (failure to disclose proceeds from causes of action arising out of prepetition personal injury).

 A failure to cooperate or being evasive with the trustee can serve as evidence of fraud by a debtor. *See In re Olmstead,* 220 B.R. at 988, 995 (debtor evasive and uncooperative in answering trustee's questions); *In the Matter of Orenduff,* 226 F.Supp. 312, 313–14 (N.D.Okla. 1964) (debtor's turning over voluminous "mess" of documents and claiming, incorrectly, that documents not turned over duplicated records already turned over was evidence of fraud); *Olsen v. Reese (In re Reese),* 203 B.R. 425, 432 (Bankr.N.D.Ill. 1997) (failure to disclose receipt of income tax refund was evidence of debtor's fraudulent intent); *Clements v. Webster (In re Webster),* Not Reported in F.Supp., 1991 WL 245006 (D.Colo.1991), at *5 (debtor's counsel mentioned contracts to trustee during a telephone conversation but contracts were never delivered to trustee as she requested and debtor never disclosed that contracts were in the name of debtor's newly formed solely owned corporation).

In summary, there can be little doubt that Ms. Silver's actions in her bankruptcy case were riddled with false disclosures and related non-disclosures that amounted to fraud.

> Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming. The record in this case shows, at the very least, cavalier indifference and a pattern of disdain for the truth. Meaningful disclosure was accorded much too low a priority. The law, fairly read, does not countenance a petitioner's decision to play a recalcitrant game, one where the debtor hides, and the trustee is forced to go seek.

*In re Tully,* 818 F.2d at 112.

c. *Lincoln's Knowledge (or Lack thereof) of the § 727(d)(1) Violations*

 That Lincoln "did not know of [Ms. Silver's] fraud until after the granting of the discharge" is an integral element of this action which Lincoln must prove. *In re Jones,* 178 B.R. at 3. Actual knowledge is not required; as mentioned above, it is enough to bar Lincoln from pursuing this action if it was on notice to inquire further and file a complaint timely. *Id.*[48] By that standard the question of Lincoln's "knowledge" is decidedly more problematic than

---

**48.** *In re Jones* provides an example of a trustee being put on notice:

> The trustee claims he did not know about the assignment until June of 1993, when he met with Mr. Rueckhaus, Mr. Gillani's attorney in the state court proceeding. The amended schedules, filed January 7, 1993 disclose the existence of the Gillani lawsuit but cannot be said to have put the trustee on notice about the assignment. The earliest the Trustee reasonably could have been expected to have known about the assignment was at the continuation of the 341

meeting on February 12, 1992, when Jardy Jones gave to the Trustee the Statement of Facts about the trailer park and discussed the Gillani lawsuit. By then, more than sixty days had elapsed since the date set for the first meeting of creditors and, therefore, the period for filing objections to discharge under § 727(a) had expired. At this point, the debtors were entitled to a discharge and the trustee's remedy was to seek a revocation of discharge.

178 B.R. at 3. (Citations omitted.)

the question of Ms. Silver's § 727 violations.

 The final deadline for filing objections to Ms. Silver's chapter 7 discharge fell on August 12, 1996. That provided Lincoln roughly fourteen weeks in which to discover a violation of § 727(a) and file an adversary proceeding. Arguably Lincoln was on notice that there might be assets, or, for that matter, transactions which Ms. Silver did not list; some evidence of this is that it began shortly thereafter to conduct discovery. Main Case, docs 27 (Rule 2004 production request), 28 (Rule 2004 production order), 31 (motion for sanctions for failure to comply with Rule 2004 production order), 33 (order requiring compliance with Rule 2004 production order), and 34 (motion for sanctions for failure to comply with compliance order). Lincoln could have asked for an extension of the deadline to object to Ms. Silver's discharge; indeed, the deadline was extended for another creditor, La Generale du Batiment. Main case, docs 17 and 24. And a creditor does need to be diligent in pursuing a discharge objection. *Collier*, ¶ 727.15[3], citing *Mid–Tech Consulting, Inc. v. Swendra*, 938 F.2d 885, 887 (8th Cir.1991) ("Thus, the burden is on the creditor to investigate diligently any possibly fraudulent conduct before discharge."). (Other citation omitted.) On the other hand, Ms. Silver's initial inadequacy of disclosure (explained in more detail below) raises the question of what Lincoln knew and when did it know it. And the statute literally only requires that "the requesting party did not know of such fraud until after the granting of the discharge".

At the first § 341 meeting, Lincoln's counsel specifically raised the issue of the divorce assets not appearing in Ms. Silver's schedules. June 341 mtg, 25:24—26:8. So clearly Lincoln was aware of the issue. However, the responses of both the Silvers to Lincoln's inquiries were such as to put Lincoln off from the inquiry. Mr. Silver made no mention of any art or artifacts or furnishings in Platinum. June 341 tr. 48:18—48:20. He smoothly asserted that what Ms. Silver contributed to Platinum was "her interest in ADS Financial". Ms. Silver did not correct or add to his testimony to say that the art and furnishings had also been transferred. Mr. Silver said that the art and furnishings that he had received were all collateralized to Los Alamos National Bank. *Id.*, 50:8–14. There was no mention of the Nambe purchase or transfer.[49]

The July 10, 1996 continued (or, apparently more properly, "adjourned") § 341 meeting, Def ex B ("July 341 mtg"), went somewhat differently. At the outset the Trustee reminded everyone that the deadline for filing objections to discharge was just thirty days away, *id.*, 5:24–25, and the Trustee's then-counsel mentioned the possibility of an extension of time on the deadline to file objections to discharge. *Id.*, 6:5–6. Under questioning Ms. Silver disclosed the transfer to Platinum of the art and furnishings of a value exceeding $300,000 from the divorce. *Id.*, 7:24–11:5 and 14:9–15:9. She also testified about Platinum more generally, including its ownership, operations, etc. (and in the process effectively disclosing that Platinum apparently was set up to provide a steady income to the Silvers and their two children). *Id.*, 18:18–29:15. Concerning the divorce, both Ms. Silver (*id.*, 38:1–25) and Mr. Silver (*id.*, 56:18–57:8)[50] testified es-

---

**49.** This does raise the irony that a debtor who has transferred assets to avoid creditors needs to be honest about having done that, or risk a creditor or trustee being able to invoke subsection (d) (1).

**50.** Ms. Silver testified first at this second session because she had a 4.00 pm appointment that day with a client. Her testimony concludes on page 39; it is not evident from the

sentially that Ms. Silver got tired of having her assets at risk because of Mr. Silver's activities. Neither hinted that the divorce was arranged in order to better accomplish asset transfers to third parties. And when questioned about Nambe, the testimony was only about renting a place to live; there was no disclosure whatever about a transfer of the right to purchase the property. *Id.*, 30:1–31:7.[51]

One of Lincoln's counsel at the time, Mr. Johnson, testified on December 12, 2003 (deposition transcript—Def ex CC) that he suspected but did not know in May 1996 that the Silvers had begun to divert assets. *Id.*, 25:5–10. But he also testified that he was unaware that *Ms.* Silver was transferring assets, *id.*, 25:23–25, and that he knew that Mr. Silver was transferring assets but did not know that Ms. Silver had anything to transfer beyond what she owned with Mr. Silver. *Id.*, 28:15–19. The Court finds that Mr. Johnson's well justified assessment of Mr. Silver's behavior[52] did not put him on notice of Ms. Silver's similar behavior.

On November 25, 1996, Lincoln filed its application for Ms. Silver's Rule 2004 examination, attaching a quite detailed and lengthy document demand. Main case, doc 27. The document request was filed more than three months after the sixty-day deadline had passed. But while the document request makes it clear that Lincoln knew that Platinum had property which Lincoln (and the Trustee[53]) would be pursuing, *id.*, Exhibit A, ¶ 3, it just as clearly evidences Lincoln's complete lack of knowledge of a transfer of the potential right of ownership in the Nambe property. *Id.*, Exhibit A, ¶ 7 (asking only for "leases and property management contracts" for various properties).

The Court has already described Ms. Silver's refusal to provide discovery voluntarily (and even involuntarily) and promptly. *Cf. In re Webster*, 1991 WL 245006 *5.[54] Add to that the completely credible testimony of the Trustee, Ms. Gonzalez, corroborating the difficulties of obtaining information from Ms. Silver; indeed, Ms. Gonzales testified that as of the trial date,

manuscript whether she was present thereafter for Mr. Silver's testimony.

51. In her deposition taken on June 2, 2004, Ms. Levy, who was Ms. Silver's attorney at the time, appears to have stated that the Nambe transaction was "known" by or "exposed" to the creditors at the July 341 meeting. Def ex EE, 35:6–7. Presumably the error was due to the passage of time, but a review of the transcript from the July 341 meeting shows emphatically that Ms. Levy's statement was not accurate.

52. Whether Mr. Johnson actually knew of Mr. Silver transferring assets or only strongly suspected it is not clear; a strong suspicion would be consistent with Mr. Johnson's grudging or wary (albeit cheerfully expressed) appreciation of Mr. Silver's considerable intelligence.

53. The Trustee had already authorized the Clerk's office to issue a notice of possible dividend, Main Case doc 19, and thereafter

filed her first asset report (doc 26) showing $2,400 for a 1992 Miata and "unknown" for the litigation against the Internal Revenue Service and for the interest in Platinum. Nothing about these entries per se would show that the Trustee was on notice of Ms. Silver's transfers, but even if they did, that would not be relevant, since the Trustee's knowledge or notice would not by itself be attributable to Lincoln.

54.

"Webster makes much of the fact that the contracts were mentioned to the Trustee during her July 28, 1988 telephone conversation with Pearlman. However, it is important to note that (1) the contracts were never sent to Clements despite her request and (2) Pearlman neglected to mention that these 'agreements' were made not with Portraits Limited or Photography Unlimited, but with PMS, an entirely new entity solely owned by the debtor."

she still had not received the documentation she requested and the amendments she was promised at the first § 341 meeting (which presumably would have been made available to Lincoln). At the same time, Ms. Silver had convinced the Trustee, at least at the beginning of the case, that she was acting in complete good faith, that she had little if any control of assets, and that she was only seeking to distance herself from her former husband for her own financial protection. All that behavior taken in context evidences Ms. Silver's motive for continuing not to disclose to be an attempt to run out the clock at least until discharge.

Discharges are supposed to be entered "forthwith" on expiration of the deadline for filing complaints, Rule 4004(c)(1) F.R.B.P.; that certainly did not happen in Ms. Silver's case. Pursuant to Rule 4004(a) F.R.B.P., the last day to object to Ms. Silver's discharge was August 12, 1996. Her discharge was not entered until December 17, 1997. If Lincoln knew of or was on notice of the fraud before the Rule 4004(a) deadline, it clearly would be barred from filing the action.[55] If it did not know of or was not on notice of the fraud until sometime after the discharge, it clearly is not barred. And then there is the possibility that Lincoln acquired the requisite knowledge between the "gap period" of August 12, 1996 and December 17, 1997.

Section 727(d)(1) speaks of not knowing of the fraud "until after the granting of the discharge". Reading the statute literally could lead to the conclusion that a trustee or creditor learning of the fraud in the gap period would be barred from filing an ac-

tion under either subsection (a) or subsection (d), odd as that result might seem. *Cf. Lamie v. United States Trustee,* 540 U.S. 526, 538, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding."), *but compare Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (debtor could not use wording of § 506(d) to "strip down" lien on real estate, although result might be different were the court writing on a clean slate). Phrased another way, once the August 12 deadline passed, was Lincoln entitled to take no action to investigate and file a § 727(a) or (d) action before the discharge was actually issued, that is, to wait until one year after the issuance of the discharge?

■ The issue is important in this adversary proceeding because if Lincoln discovered the fraud in the gap period, that fact might or might not bar the § 727(d)(1) count depending on the interpretation of the statute. Lincoln did not file its action until after the discharge had issued; if Lincoln discovered the fraud within the gap period and the statute required Lincoln to have filed the complaint within that gap period, Lincoln will be barred from pursuing this § 727(d)(1) relief.

The court in *In re Staub,* 208 B.R. 602, faced exactly this "gap" question when the United States Trustee received the information that led to the filing of the complaint on November 20, midway between the expiration of the Rule 4004(a) deadline on November 13 and issuance of the dis-

---

55. Apparently there is no allowance as such for processing information and preparing a complaint between when the objecting party learns of the violation and when the adversary proceeding must be filed. *Compare* Rule 4004(a) *with* Rule 9006(f) (additional three days allowed when service is by U.S.P.S. mail). Thus, in *Staub,* the trustee had all of about eight days to examine and process the information and file the complaint. Not that the creditor or trustee is without a remedy; an extension of time is easily requested and obtained, although that request must be filed within whatever time is left to file a complaint. Rule 4004(b).

charge on November 29. The United States Trustee filed the revocation action on January 19. The debtor relied on the "plain language" of § 727(d)(1) to argue that the United States Trustee was barred from bringing the complaint.

The interpretation advanced by the Debtors affords persons committing fraud in their Chapter 7 case and in the procurement of their discharge a safe haven, the gap period described, to confess their sins, i.e. to disclose their fraud and avoid any consequence, a plainly unfair and inequitable result. When a discharge is not entered "forthwith" after the expiration of the FRBP 4004(a) period and until a discharge is actually entered, even though a complaint objecting to discharge under § 727(a) would not be timely, a party may properly file a complaint under § 727(d) to revoke the discharge for conduct occurring prior to the expiration of the FRBP 4004(a) period which the party did not discover in time to file a complaint under § 727(a). *England v. Stevens (In re Stevens)*, 107 B.R. 702 (9th Cir. BAP 1989). The administrative delay in the issuance of the discharge does not create a safe haven gap period where individuals procuring a bankruptcy discharge through fraud may avoid the consequence of their conduct.

*Id.*, at 606–07; *accord, Citibank, N.A. v. Emery (In re Emery)*, 132 F.3d 892, 895–96 (2d Cir.1998) (precluding creditor from pursuing a claim that it learned of after the 4004(a) deadline and before discharge would produce a result demonstrably at odds with the drafters' intentions; creditor was not required to have obtained an extension of the deadline). *See also Ross v. John Mitchell, Inc. (In re Dietz)*, 94 B.R. 637, 641–42 (9th Cir. BAP 1988), *aff'd In re Dietz*, 914 F.2d 161 (9th Cir.1990) (trustee learned of the violation three days after the 4004(a) deadline but filed the adversary proceeding [under both subsections

(a) and (d) ] before the formal order of discharge was issued; complaint allowed to proceed); *England v. Stevens (In re Stevens)*, 107 B.R. 702 (9th Cir.BAP1989) (trustee had filed a § 727(d) action after the Rule 4004(a) deadline but before the discharge was issued; complaint permitted).

On the other hand, *Powell v. First Nat'l Bank (In re Powell)*, 113 B.R. 512, 513 (W.D.Ark.1990) ruled as follows:

It is true that it is difficult, perhaps impossible, to imagine why these bodies [Congress and the Supreme Court] would have wanted to allow discharges to be avoided by frauds discovered within 60 days of the creditors' meeting regarding discharge and by frauds discovered after discharge, but not by frauds discovered in the interim. But the Court does not conceive it to be its job to rationalize this statute and the rule.

*Id.* at 513. *Accord, Employers Mutual Casualty Co. v. Lazenby (In re Lazenby)*, 253 B.R. 536 (Bankr.E.D.Ark.2000), which denied a creditor the right to amend a complaint to add a § 727(a)(4) claim after the 4004(a) deadline but before the issuance of the discharge. The court found that the creditor was on notice of the requisite facts before the expiration of the sixty days but ruled that, even if the creditor had learned of the fraud in the gap period, the statute's plain language would have precluded the amendment.

The courts representing the two halves of Arkansas reached the correct result. The wording of the statute is clear: "the requesting party [must] not know of such fraud until after the granting of the discharge." Even if Rule 4004(a) sets an earlier deadline for filing such complaints, the rule or its effect cannot be construed to change the statute. 28 U.S.C. § 2075 ("Such rules shall not abridge, enlarge, or modify any substan-

tive right."). In this instance, the interposition of the Supreme Court rule requiring that the discharge be entered "forthwith" and setting an early bar date for a § 727(a) action may well have misled Lincoln into thinking it was barred from filing a § 727(a) action, but it cannot be construed to have permitted Lincoln to make itself into a post-discharge-knowledge creditor when it is not, in direct contradiction of the statute. It is undoubtedly true that Congress did not intend such a quirky result (although the oddity of the result is not really the fault of Congress[56]). And this interpretation provides arguably contradictory incentives to both debtors and creditors: a debtor in Ms. Silver's position will want the entry of the discharge delayed as long as possible, and a creditor will want the discharge issued immediately upon the expiration of the sixty days. *Cf. In re Jones,* 178 B.R. at 4 ("Although the trustee did not receive this information until it was too late to file a timely objection to discharge, there is no indication this timing was in any way calculated or controlled by the debtor to their benefit."). Nevertheless, "as long as the statutory scheme is coherent and consistent, there is generally no need for a court to inquire beyond the plain language of the statute." *United States v. Ron Pair Enterprises,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).[57]

Lincoln was not without any remedy, notably the right to request one or more extensions of time to conduct a sufficient investigation. Rule 4004(b), F.R.B.P. In fact, another creditor, La Generale du Batiment, did exactly that. Doc 24. Lincoln did not do that.[58]

It is important to note what is being decided here. This is not a case in which Lincoln filed an action after the Rule 4004(a) deadline but before the entry of the discharge, thereby finding itself caught in the no man's land created by the rule. Rather, Lincoln waited through the period until the discharge was entered and then (deep) into the post-discharge period.

■ Thus, what did Lincoln know and when did it know it? As measured by the standard of a preponderance of the evidence, *e.g., In re Jones,* 178 B.R. at 3, the Court finds that Lincoln was at a minimum on notice of the transfer of the divorce assets to Platinum and Ms. Silver's failure to disclose that transfer in her schedules or SOFA, even prior to August 12, 2006. In the words of the statute, Lincoln "knew" of Ms. Silver's fraud with respect to those assets, and is barred from pursuing a revocation of Ms. Silver's discharge with respect to those assets.

At the same time, Lincoln did not know of the Nambe transfer before August 12, 1996. However, on May 1, 1998, it and the Trustee filed an adversary proceeding, *Gonzales v. Silver,* No. 98–1091, in which it sought among other things the avoidance of several fraudulent transfers and recovery of the associated assets. Among the

---

56. Rule 4004, which essentially created this problem (albeit based on former Rule 404), was not promulgated until 1983. *Compare* § 15 of the Bankruptcy Act, former 11 U.S.C. § 33, quoted in note 13 above.

57. Congress could of course amend the statute to address the problem. Indeed, the Supreme Court could itself fix this problem by amending the rule. What is not possible is for this Court to either amend the rule or override the statute.

58. Nor was it required to. Indeed, had the discharge been issued immediately following the sixty days and Lincoln thereafter gained the requisite knowledge, Ms. Silver would have no cause to complain that a § 727(d) action rather than a § 727(a) action was being filed. Of course, a creditor that does not ask for an extension of time if it has any reason to do so puts itself at risk of being caught in the Rule 4004 "no man's land".

identified assets was the Nambe property. *Id.*, ¶ 37.[59] It may be that Lincoln and the Trustee learned of, or were put on notice of, the change in the potential ownership of the Nambe property when they took Ms. Silver's deposition in October 1997. Pl ex 78 at 4.[60] Regardless, Lincoln had the burden of proving it did not know and was not on notice of the transfer of the Nambe purchase rights before the entry of the discharge, and it did not meet that burden. In consequence, Lincoln is also barred from claiming it "did not know" of the transfer of the rights to purchase the Nambe property.

In fact, by October 1997, Ms. Silver's bubble of credibility unquestionably had burst. Practically speaking, Lincoln was on notice to examine all the assets of Platinum, SCT and any other related entities or persons.

### 4. Violations of Section 727(d)(2)

The complaint (doc 1) does not specify what part of § 727(d) it relies on. *See* ¶ 2 and the prayer for relief (citing only to § 727(d)). The specific wording of ¶¶ 39 and 43 (for Counts 1 and 2 respectively) recite identically that "[b]y her actions described hereinabove, Jerilyn Silver committed fraud that, if known to the Court prior to discharge, would have barred the discharge." In his opening statement and closing argument, counsel for Lincoln stated that the action was brought under both subsection (d)(1) and subsection (d)(2) of § 727. And in the rebuttal portion of his closing argument, Lincoln's counsel moved to amend to conform to the evidence.

Rule 7015 F.R.B.P, incorporating Rule 15(b), F.R.Civ.P. Lincoln's Trial Memorandum begins by citing both subsections. Doc 141, at 1. Ms. Silver's counsel did not dispute that subsection (d)(2) was at issue or otherwise object. The Court therefore considers that the action was submitted to the Court on both grounds.

### a. The elements of a § 727(d)(2) action

Subsection (2) of § 727(d) provides as follows:

> On request of the trustee, a creditor, or the United States trustee, and after notice and hearing, the court shall revoke a discharge granted under subsection (a) of this section if-
>
> . . .
>
> (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee; . . . .

The statute does not literally require that the complaining creditor not know of the acquisition and failure to report or turn over until after the discharge. Nevertheless, some courts have read this requirement into this part of the statute as well. *E.g., Canfield v. Lyons (In re Lyons),* 23 B.R. 123, 125–26 (Bankr. E.D.Va.1982) (in a § 727(d)(3) action, trustee's knowledge before discharge was issued precluded trustee from bringing the

---

59. Paragraph 37 recites as follows:

In October 1995, David Silver began negotiating for the purchase of a house in Nambe, New Mexico. The $495,000 sale closed in June 1996. Platinum Group and the Children's Trusts took title to the property, but ADS Financial provided at least $147,000 of the $263,000 down payment. David and Jerilyn Silver live there today.

60. The Trustee's asset reports, which Lincoln arguably would be charged with reading, do not mention this asset at any time, from the first report in October 1996 (Main Case, doc 26) to the most recent in September 2006 (doc 94). Those reports were filed semiannually through 2002 and then annually thereafter. Docs 26, 30, 28, 41, 43, 63, 69, 71–77, 83, 92–94.

revocation action); *contra, Colombo Bank v. Barnes (In re Barnes)*, 348 B.R. 613 (Bankr.D.D.C.2006) (plain language of § 727(d)(3) did not preclude trustee who had knowledge of debtor's refusal to answer questions prior to his discharge from bringing a revocation action). The careful reasoning of the *Barnes* case, even though it is a § 727(d)(3) case rather than a § 727(d)(2) case, is easily sufficient to convince this Court of its correctness. In consequence, the Court holds that Ms. Silver's failure to report to the Trustee her entitlement to certain property and to turn over that property to the Trustee violates § 727(d)(2) regardless of when Lincoln knew or should have known of the possession or control of the property.

■ Similarly, nothing in the statute's terms limits its reach to property that the debtor has acquired only after the filing of the petition. What would happen under *Lyons* if, for example, the debtor had acquired property prepetition and then continued to refuse to turn over the property despite repeated demands by the trustee until after the sixty days had passed? It is not at all unreasonable for Congress to have determined that such obstinance or bad faith should deprive a debtor of a discharge. In consequence, Lincoln is also entitled to seek revocation not only for property that Ms. Silver acquired, or reacquired, after the petition was filed (and failed to disclose to and turn over to the Trustee), but also for property that Ms. Silver possessed before the filing of the petition and continued to possess (and did not disclose to or turn over to the Trustee) after the petition was filed.

### b. *Violations of § 727(d)(2)*

■ From what has been said already, it is apparent that Ms. Silver violated § 727(d)(2) in several ways.

To begin with, she failed to report and then turn over to the trustee the art and furnishings that she had transferred to Platinum. The fact was that with a 49% (or perhaps 61%—Pl ex 48) ownership of the LLC and her executive control of the company, she could have delivered the assets back to the Trustee, even after the filing of the petition. She did not do so. And even at the end of the series of corporate transfers of the assets, it is clear that she either retained or reacquired[61] possession and control of the art and furnishings, yet she still has not turned them over to the Trustee.

Similarly, immediately following the filing of her petition, when she and Mr. Silver still had the rights to purchase the Nambe property, she could have disclosed those rights and delivered hers to the Trustee. She did not.[62]

Throughout the time around the filing of the petition and then for months afterward, Ms. Silver had available to her experienced and competent bankruptcy counsel in the person of Ms. Levy. Had Ms. Silver disclosed to her counsel and sought her counsel's advice about compliance with the

---

**61.** It appears to the Court that the most accurate characterization of the events is that Platinum legally owned the art and furnishings in question until it was dissolved, and that upon dissolution, the legal ownership merged with the possessory interest that Ms. Silver already had. And clearly all the other interested parties in effect concurred in this result (wittingly or unwittingly), as evidenced by the fact that no one sought to take any of the art and furnishings away from her.

**62.** From what has been said, the Court does not need to discuss the Albert & Leonard transactions in detail, which took place long after the filing of the petition in any event, or the other transfers, such as of the vehicle or other gifts to the Silver Children's Trust or the issuance of shares in Platinum to the professionals.

requirements of the Code, she undoubtedly would have been told of her obligation to disclose and deliver the assets. That Ms. Silver did not do so is merely further evidence of Ms. Silver's (initially) successful evasion of her duties as a debtor and her violations of § 727(d)(2).[63]

## 5. Conclusion

At the end of the day, it is quite clear the Ms. Silver, in cooperation with Mr. Silver, violated both the spirit and the letter of the Bankruptcy Code. And although Lincoln as the complaining creditor clearly did not act soon enough with respect to some of those violations, its (literally) midnight filing was soon enough to catch Ms. Silver's § 727(d)(2) violations. For that reason Ms. Silver's discharge must be revoked. A judgment will issue.

**63.** Lincoln also asserted that the $8,000 per month that Ms. Silver received from Platinum constituted property that should have been turned over to the Trustee. Lincoln did not prove that the funds paid to Ms. Silver were directly traceable to property that should have been delivered to the Trustee; in fact, it appears that those funds may well have been no more than postpetition payments for personal services which a chapter 7 debtor is entitled to keep. § 541(a)(6).